Liza Mae WELLS, John A. Wright,
Robert L. Kelly, Appellants,

v.

UNITED STATES, Appellee.

Nos. 84–1743, 84–1745 and 85–42.

District of Columbia Court of Appeals.

Argued June 10, 1986.
Decided Oct. 1, 1986.

Clifford Patrick Ennist, Washington, D.C., appointed by this court, for appellant Kelly.

Douglas R. Sparks, Washington, D.C., appointed by this court, for appellant Wells.

Wendell C. Robinson, Washington, D.C., appointed by this court, submitted on the brief, for appellant Wright.

Lee F. Satterfield, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Wash-

ington, D.C., were on the brief, for appellee.

Before FERREN, TERRY, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

A jury found appellants Wright, Wells, and Kelly guilty of possession of heroin, D.C.Code § 33–541(d) (1985 Supp.) and of drug paraphernalia with intent to use it unlawfully, *id.* § 33–603 (1985 Supp.). Wright was also convicted of carrying a pistol without a license, *id.* § 22–3204 (1981), possession of an unregistered firearm, *id.* § 6–2311(a) (1981), and possession of unregistered ammunition, *id.* § 6–2361(3) (1981). All appellants object to the jury selection process as contrary to Super. Ct.Crim.R. 24, and challenge the sufficiency of the evidence. Wells also objects to the instruction regarding jury unanimity, and Kelly contends the trial court erred in instructing the jury on aiding and abetting the possession of heroin. Because the trial court failed to comply with Rule 24 in selecting the jury but appellants' contentions about the sufficiency of the evidence are unpersuasive, we reverse and remand for a new trial.

I

Rule 24 provides in pertinent part:

(b) *Peremptory challenges.* * * * If there is more than 1 defendant, or if a case is prosecuted both by the United States and the District of Columbia, the Court may allow additional peremptory challenges and permit them to be exercised separately or jointly, but in no event shall 1 side be entitled to more peremptory challenges than the other. The prosecution shall be called upon to make the 1st peremptory challenge with each side proceeding in turn thereafter.

(c) *Alternate jurors.* * * * * Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 alternate jurors are to be impaneled, 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled, and 3 peremptory challenges if 5 or 6 alternate jurors are to be impaneled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by these Rules may not be used against an alternate juror.

Appellants [1] contend that the trial judge effectively gave the prosecution one extra peremptory strike by designating jurors # 13 and 14 as alternate jurors after both sides had exercised their four peremptory strikes and the defense had used its fourth strike against the juror originally sitting in seat number 13. Thus, one of the four defense challenges had been used against an alternate, whereas all four of the government challenges had been used against regular jurors rather than alternates. They maintain this violates the provision of Rule 24(b) that "in no event shall 1 side be entitled to more peremptory challenges than the other," and the provision of Rule 24(c) that strikes against regular ju-

---

1. We treat all appellants as having raised the Rule 24 issue even though only Kelly addressed it in his brief on appeal. During oral argument the court asked counsel for Wells whether he wished to join Kelly's Rule 24 objections on appeal, and Wells' counsel adopted Kelly's position. Counsel for Wright did not appear at oral argument, but submitted on the brief. Normally, Wright would be deemed to have waived his objections. *See, e.g., Fisher v. United States,* 328 U.S. 463, 467, 66 S.Ct. 1318, 1320, 90 L.Ed. 1382 (1946); *cf. Allen v. United States,* 495 A.2d 1145, 1153–54 (D.C.1985) (en banc). However, an appellate court may, in its discretion, take note of a material trial error that has not been pressed

on appeal. *See Fisher, supra,* 328 U.S. at 467–68, 66 S.Ct. at 1320–21; D.C.Code § 11–721(e) (1981). The right to peremptory challenges, although not guaranteed by the Constitution, is regarded as necessary to a fair and impartial trial. *See Batson v. Kentucky,* — U.S. —, 106 S.Ct. 1712, 1720, 90 L.Ed.2d 69 (1986); *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894); *Butler v. United States,* 377 A.2d 54, 56–57 (D.C.1977); *Armwood v. United States,* 373 A.2d 895, 897 n. 6 (D.C.1977). *Cf. Boone v. United States,* 483 A.2d 1135, 1141–42 (D.C.1984) (en banc) (defendant's right to be present at bench during voir dire of jurors).

rors may not be used against alternates, and vice versa.

▉ The government concedes the violation of Rule 24, but argues that it was not sufficiently prejudicial to cure appellants' failure to object in the trial court, and that, in any event, there was no prejudice since the defense and prosecution were placed in the same position under the trial judge's procedure of selecting alternates after all the challenges had been made. We reject both arguments. First, appellants are not required to object to the jury selection process at trial in order to preserve the Rule 24(b) error for review on appeal. *See Butler v. United States,* 377 A.2d 54, 56–57 (D.C.1977) (Rule 24(b) error reviewable even though defense counsel did not object to jury selection procedure at trial); *Armwood, supra,* 373 A.2d at 897. Second, this court has distinguished between the requirements of parity and protection of a defendant's effective use of peremptory challenges.

In *Taylor v. United States,* 471 A.2d 999, 1003 (D.C.1983), appellant contended voir dire procedures violated his statutory right to make peremptory challenges, D.C. Code § 23–105(a) (1981); Super.Ct.Crim.R. 24(b). The trial judge had altered the peremptory challenge procedure midway through the exercise of challenges at a point when the defense and prosecution were in parity, each having struck seven jurors. *Id.* at 1003. The court held that under these circumstances the procedural change, if error, was not prejudicial since it did not frustrate appellant's effective exercise of his ten peremptory challenges. *Id.* at 1004. The court advised trial courts in the future "to apprise the parties of the rules which will govern the jury selection prior to the start of the process." *Id.* In contrast, in *Armwood, supra,* the trial judge failed to follow his own procedure, that a pass would count as a challenge, during the exercise of peremptory challenges and as a result, the government had one more challenge than the defense. The court reversed, holding that the spirit of

*Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), had been violated. *Armwood, supra,* 373 A.2d at 897.

▉ Peremptory challenges, in part, assure the trial's impartiality, *cf. Boone, supra,* 483 A.2d at 1138 (citing *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)), and are viewed as "one of the most important rights secured to the accused." *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed.2d 208 (1984) (cited in *Taylor, supra,* 471 A.2d at 1004, and *Armwood, supra,* 373 A.2d at 897 n. 6). "Any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of [the right to challenge a given number of jurors without showing cause], must be condemned." *Id.* 151 U.S. at 408, 14 S.Ct. at 414. Hence, where the trial judge frustrates the defendant's "effective use" of peremptory challenges, the defendant need not demonstrate prejudice to obtain reversal of a conviction. *Butler, supra,* 377 A.2d at 56; *Armwood, supra,* 373 A.2d at 897 n. 6. Here the manner in which the trial judge selected the alternate jurors prevented defense counsel from segregating their peremptory strikes between regular and alternate jurors. As a result, contrary to Rule 24(b), the government had one more strike than the defense. Accordingly, the convictions must be reversed.

II

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor. *Patterson v. United States,* 479 A.2d 335, 337–38 (D.C.1984); *Boyd v. United States,* 473 A.2d 828, 832 (D.C.1984). Reversal is required "only where there is no evidence upon which a reasonable mind could infer guilt." *Patterson, supra,* 479 A.2d 338; *see Franey v. United States,* 382 A.2d 1019, 1022 n. 6 (D.C.1978).

Officer Lakeman testified that while on his police scooter on September 14, 1984, at

11:44 a.m., he observed what appeared to be a disabled car with its engine hood up in the Kenilworth Recreation Center parking lot; it was the only car in the lot. Three people were inside the car, and one person, later identified as James Robertson, stood near the trunk wiping the car with a rag without any wax or water. Lakeman became suspicious because in two or three of the fifty narcotics arrests he had made, one person was wiping down the car to act as a lookout. As Lakeman approached the car, Wright emerged from the driver's seat, threw something which was subsequently found to be a syringe, toward the back wheel of the car, and began talking with Robertson. Wells was seated on the passenger side of the front seat and Kelly was seated in the back. Lakeman asked Wright for identification and whether there was something wrong with his car. Wright responded that he was cooling the engine; the car did not appear overheated to Lakeman. Lakeman looked inside the car and saw two bottle caps and a blood-stained necktie on the front seat, and the white handle of a revolver sticking out from under the front seat.[2] Kelly was holding a half gallon jug of water. Lakeman seized the gun,[3] called for police assistance, and ordered Wells and Kelly out of the car. The police subsequently seized from the interior of the car, the necktie, bottle caps and the jug of water, as well as two books of matches, a small box containing several rounds of .22 caliber ammunition from the top of the transmission hump in the front seat, and a plastic vial containing a clear liquid from the rear seat, and from the trunk of the car, two more syringes, another charred bottle cap, and two plastic bags of white powder. Also seized were two packets of white powder which Wells threw underneath the car and a third

packet lying on the ground directly next to her.

Wright, Kelly, and Robertson testified that Kelly had called Wright for assistance after his car had overheated and needed water. Wright then borrowed his father's car, between 9:00 and 9:30 a.m., but before leaving to meet Kelly, Wells and Robertson asked for rides. After stopping at a liquor store to buy beer, they picked up Kelly outside about fifteen minutes later. They stopped at an apartment building so Kelly could get water, and then began the drive to Kelly's car. When Wright's car began to overheat, he drove into the parking lot. They denied knowledge of the heroin, syringes, gun or ammunition; Robertson and Kelly denied seeing Wells throw anything to the ground, and Wright claimed Wells did not use heroin.

The government relied on a theory of constructive possession. Thus, to prove that appellants constructively possessed the heroin or paraphernalia, the government had to prove, beyond a reasonable doubt, that each appellant was "knowingly in a position or [had] the right to exercise dominion and control over it." *Wheeler v. United States*, 494 A.2d 170, 172 (D.C.1985); *United States v. Covington*, 459 A.2d 1067, 1071 (D.C.1983); *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). " '[T]he critical inquiry for judges is whether the factfinder can reasonably conclude from the proof that the accused likely had some appreciable ability to guide the destiny of the drug.' "; *Hubbard, supra*, 429 A.2d at 1338 (quoting *United States v. Staten*, 189 U.S.App.D.C. 100, 105, 581 F.2d 878, 883 (1978)). "[T]he right to exercise dominion and control may be jointly shared."

---

**2.** Lakeman called the bottle caps "bottle cap cookers," referring to their possible use as containers for reducing heroin to liquid form by heating. He testified that the two bottle caps seized from the front seat had residue in them, and one of those two had been charred by something hot. A third bottle cap, which was seized from the trunk, also was charred.

**3.** The gun, which was loaded with .22 caliber ammunition, was test fired and found to be operable. The government introduced a certificate that Wright did not have a license to carry and had not registered a pistol in the District of Columbia.

*Wheeler, supra,* 494 A.2d at 172; *Covington, supra,* 459 A.2d at 1071. To prove constructive possession, the government also must present some evidence connecting the accused to "an ongoing criminal operation of which the possession is a part." *Covington, supra,* 459 A.2d at 1071; *Hubbard, supra,* 429 A.2d at 1338. "[M]ere presence at the scene of the crime, ... proximity to the drugs, or ... association with one in possession" is not enough to allow a jury to find constructive possession. *Hubbard, supra,* 429 A.2d at 1338; *see Covington, supra,* 459 A.2d at 1071. Sufficient evidence has included evidence that the illegal substances were in plain view;[4] or that the accused lived in the room or home where the contraband was found;[5] or that the accused attempted to conceal or destroy the contrabrand,[6] or was observed making a transaction later found to involve narcotics,[7] or exhibited some other consciousness of guilt, such as locking a door, not answering the door after the police identify themselves, or flight.[8]

■ Wright's claim that the government's evidence was insufficient is meritless. Two bottle caps containing a residue of heroin and the stained necktie were found next to him on the front seat. As Lakeman approached, Wright discarded a syringe.[9] Heroin, syringes, and a third bottle cap containing heroin residue were found in the trunk, which Wright knew needed to be opened with a screwdriver, which he readily produced. The gun was directly under the seat in which Wright was sitting and partially visible; ammunition matching the gun caliber was in close proximity to him in a box. Hence, the jury could reasonably find that Wright had knowledge of the presence of the drugs, the drug paraphernalia, the gun and ammunition, and that his access to the trunk of the car gave him the ability to guide the destiny of the heroin and paraphernalia found there. From the evidence that the car had been parked, the condition of the cookers and necktie, and presence of the water, the jury could reasonably infer Wright possessed the drugs and drug paraphernalia with intent to inject heroin.

■ Wells' challenge to the sufficiency of the evidence is limited to the contention that, because a chemical analysis was not performed on each individual packet found to contain heroin, it was impossible for the jury to find she was in constructive possession of a useable amount.[10] We disagree. Lakeman observed Wells throw two packets of heroin to the ground and another officer retrieved a third packet lying directly next to Wells. Therefore, from Wells' immediate proximity to the three packets and her attempt to conceal two of them, the jury could reasonably find that she was in constructive possession of at least three of the packets. The government presented

4. *Stewart v. United States,* 395 A.2d 3, 6 (D.C. 1978); *Hooker v. U.S.,* 372 A.2d 996, 997 (D.C. 1977).

5. *Wheeler, supra,* 494 A.2d at 171; *Stewart, supra,* 395 A.2d at 5–6; *Hooker, supra,* 372 A.2d at 997.

6. *Wheeler, supra,* 494 A.2d at 171; *Hack v. United States,* 445 A.2d 634, 637 (D.C.1982).

7. *Hubbard, supra,* 429 A.2d at 1338.

8. *Wheeler, supra,* 494 A.2d at 171; *Covington, supra,* 459 A.2d at 1071; *Hack, supra,* 445 A.2d at 637.

9. Since the area in which Wright threw the syringe was not cluttered with debris, and Lakeman actually saw something leave Wright's hand, Wright's reliance on *Malloy v. United States,* 246 A.2d 781 (D.C.1968), is misplaced.

10. An expert in analytical chemistry, who had performed tests on the evidence, obtained the following results: (1) all five plastic packets contained some heroin; (2) the aggregate weight of the contents of the five packets was 1,720 milligrams, of which 7.7% was heroin and the rest was an uncontrolled substance (quinine or some other type of sugar substitute); (3) the residue in the three bottle caps was heroin; (4) the residue in the syringes was of an uncontrolled substance; and (5) the plastic vial did not contain a controlled substance. The tests did not determine the percentage of heroin contained in each individual packet; the testing sample was an aggregate of samples from all five packets.

expert testimony that all of the seized items, except the gun and ammunition, could have been used to prepare and inject the heroin.[11] Wells' presence in the front seat next to physical evidence of what the jury could find was an ongoing criminal operation—Wells had the heroin, Wright had the syringe, Kelly had the water, and the bloody tie, matches, and two bottle caps with residue were on the seat between Wright and Wells—provided sufficient evidence for the jury reasonably to find that Wells constructively possessed heroin in a useable amount. The government is not required to quantify the exact purity of the heroin in each package as long as the substance seized consisted of more than mere traces of heroin and can be identified as heroin. *Cf. Hawkins v. United States*, 482 A.2d 1230, 1232–33 (D.C.1984) (cocaine); *Moore v. United States*, 374 A.2d 299, 303 (D.C.1977) (marijuana).

■ Finally, turning to Kelly's challenge of the sufficiency of the evidence, we are satisfied that the jury could reasonably find the combination of circumstances directly linked him to an ongoing criminal operation. Kelly was in the parked car with Wright and Wells who had two parts of the drug operation. Kelly had the third part, the water necessary to dilute the heroin and flush the syringe; he was also in immediate proximity to the smaller vial in the back seat. All of the items retrieved from the car, except the gun and ammunition, were connected to the use of the heroin. The jury could reasonably find Kelly

had seen the syringe prior to the time Wright had discarded it and that he had seen the packets discarded by Wells; no evidence was offered that the front seat of the car blocked his view.

■ That Kelly did not attempt to conceal or destroy evidence or to avoid the police is not determinative. Although no one testified that any of the appellants appeared to be under the influence of a narcotic drug, or that any of the bottle caps appeared hot from a recent application of heat, there was sufficient evidence from which the jury reasonably could find that the stains on the necktie were made when the syringe, filled with the heroin diluted with water and cooked in a bottle cap, punctured the skin going into the vein raised by the use of the tie as a tourniquet, and that the paraphernalia were being used for a criminal purpose. *Covington, supra,* 459 A.2d at 1071. We defer to the jury's ability to weigh the evidence and evaluate the witnesses' credibility. *Boyd, supra,* 473 A.2d at 832.[12] For similar reasons, Kelly's contention that the evidence was insufficient to show that he aided and abetted the possession of heroin, is meritless.

Accordingly, since the government met its burden to present sufficient evidence against each appellant,[13] we reverse and remand for a new trial. *See Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Fitzgerald*

---

11. An expert in the usage and sale of narcotics testified that all of the seized items could have been used to administer heroin subcutaneously or intravenously: water and heroin are mixed in a bottle cap, which is heated to transform the heroin into liquid form; a tourniquet, such as a necktie, is applied to expand a vein; a plastic vial (such as a small medicine container) is used to transport the drug or to carry water; more than one person can use a syringe, but the syringe must be flushed with water between each use. The expert also testified that two milligrams of heroin is considered a useable amount, four milligrams a dosage, and, therefore, the 33 dosages was well in excess of a useable amount.

12. We also find meritless Kelly's contention that the aiding and abetting instruction in a constructive possession case is prejudicial and improper because the elements of each are identical for the purposes of conviction. The two offenses are not identical. *See, e.g., Wheeler, supra,* 494 A.2d at 172 (constructive possession); *Selby v. United States,* 501 A.2d 800 (D.C.1985) (aiding and abetting); *Quarles v. United States,* 308 A.2d 773, 774–75 (D.C.1973) (same).

13. Robertson was acquitted of all charges.

*v. United States,* 472 A.2d 52, 53 (D.C. 1984).[14]

---

14. Wells' contention that the trial court erred in giving the jury the standard unanimity instruction instead of instructing the jury unanimously to find Wells was in possession of a particular packet of heroin, is meritless. The events leading up to Wells' arrest and indictment comprised only one incident. *Compare Davis v. United States,* 448 A.2d 242 (D.C.1982), *with Hack v. United States,* 445 A.2d 634, 637 (D.C. 1982).