**Richard L. LYONS, a/k/a Walter Lyons, Appellant,**

v.

**UNITED STATES, Appellee.**

**Pamela K. COOPER, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 89–CF–250, 89–CF–299.

District of Columbia Court of Appeals.

Reargued June 3, 1993.
Decided July 28, 1994.

---

7. The trial judge did not reach appellee's separate claim of promissory estoppel in regard to the promise of college aid.

W. Gary Kohlman, Washington, DC, for appellant Lyons. Brenda Grantland, Mill

Valley, CA, was on the brief for appellant Lyons.

Daniel M. Schember, Washington, DC, appointed by this court, for appellant Cooper.

Roy W. McLeese, III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Terence J. Keeney, and Peter R. Zeidenberg, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and TERRY, Associate Judges, and KERN, Senior Judge.*

Opinion for the court by Associate Judge TERRY.

Concurring opinion by Senior Judge KERN at p. 20.

TERRY, Associate Judge:

This case arises from a murder for hire committed in the course of appellants' cocaine-selling operation. Following a three-week trial, a jury found appellant Lyons guilty of first-degree murder while armed,[1] assault with a dangerous weapon (ADW),[2] and conspiracy to distribute cocaine;[3] appellant Cooper was found guilty of second-degree murder while armed,[4] ADW, conspiracy to distribute cocaine, and carrying a pistol without a license.[5] Both Lyons and Cooper appealed, and in *Lyons v. United States,* 606 A.2d 1354 (D.C.1992), we reversed their convictions and ordered a new trial. Although we rejected most of their claims of error, we held that the government's inadvertent failure to identify one of its witnesses during jury selection had violated appellants' Sixth Amendment right to an impartial jury.

The government filed a petition for rehearing, and in orders entered December 1 and 17, 1992, we vacated our original opinion,

granted the petition for rehearing, and instructed the parties to file "supplemental briefs addressing the issue of whether the trial court's denial of the motion for mistrial, based on the association between a juror and a government witness, was or could be harmless error. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302] (1991)." Now, having considered the supplemental briefs and heard further argument, we conclude that this error was not harmless; accordingly, we once again reverse and remand for a new trial.

In the opinion that follows, parts I and II are expanded versions of the corresponding sections of our original opinion in this case. In part II we make explicit what was only implicit in our previous opinion (and in several others in the past): that any infringement of a defendant's right of peremptory challenge is reversible error *per se,* and that such error can never be harmless. The remainder of this opinion, parts III through VII, is substantially the same as before, with only a few minor changes.

### I

Appellants operated a cocaine-selling business in the area of North Capitol and O Streets, Northwest. Lyons would cut, package, and supply cocaine to other persons known as "runners," who would then sell the drug on the street. Cooper was one of Lyons' intermediate distributors as well as a runner. Sometime in the summer of 1985, Stephen Royster, also known as "Rex," began to cause trouble for appellants by stealing cocaine from them and their runners. Finally, in early February 1986, Lyons approached Daniel Roy and offered him money and cocaine to kill Royster. After initially hesitating, Roy accepted the offer.[6]

---

* Former Chief Judge Rogers was a member of the division that heard oral argument and reargument in this case. After her departure from the court, Judge Kern was selected by lot to replace her.

1. D.C.Code §§ 22–2401 and 22–3202 (1989).

2. D.C.Code § 22–502 (1989).

3. D.C.Code § 33–549 (1988).

4. D.C.Code §§ 22–2403 and 22–3202 (1989).

5. D.C.Code § 22–3204 (1989).

6. In accordance with a plea bargain, the government agreed to let Roy plead guilty to second-degree murder in return for his full cooperation in the investigation and prosecution of all the other persons involved in the shooting of Stephen Royster.

On February 26 Roy was selling cocaine for Lyons on North Capitol Street when Royster approached him and asked where Lyons was. Roy replied that Lyons was around the corner, and Royster went to talk with him. Roy then told another runner, Derrick Wimple, to "go get the pistol" because, Roy testified, he "figured that was the time" to kill Royster. Wimple went to Cooper's house, which was a short distance away on North Capitol Street, and there Cooper gave him a .38 caliber revolver. He brought the gun back to Roy, who then walked up to Royster on the street and shot him several times. After the shooting, Roy walked "nine steps" down the street to Cooper's house, handed her the gun, and left the area. According to Roy's testimony, Cooper was standing outside in front of her house and saw the shooting take place. Royster died two weeks later of his wounds.[7]

Jury selection in this case extended over two days. At the end of the first day, after nine jurors had been chosen, there were no more venire members left. Consequently, a new venire had to be summoned on the second day so that the remaining three jurors and three alternates could be chosen. A full *voir dire* of the second venire was conducted on the second day. Each day, as part of the *voir dire* of both venires, counsel for the parties identified, in person or by name, the witnesses who might be called during the course of the trial. On the second day of jury selection, however, the prosecutor named four additional witnesses whom he had not mentioned the previous day, one of whom was Detective James McCoy of the Metropolitan Police.

Very late in the trial, the court and all counsel learned for the first time that a juror selected on the first day of *voir dire* knew Detective McCoy, one of the government witnesses whose name had been inadvertently omitted by the prosecutor in his naming of the witnesses that day. About a half-hour after the jury began its deliberations, McCoy informed the prosecutor that he had recognized one of the female jurors when he had testified two days earlier.[8] The prosecutor immediately reported this fact to the trial judge, who halted jury deliberations and held a hearing at which both the juror and Detective McCoy testified.

At that hearing the judge noted that the juror in question had been chosen on the first day of *voir dire*, and that on that day the prosecutor had not mentioned McCoy as a prospective witness, nor were the prospective jurors asked whether any of them had any relatives or close friends in law enforcement. The testimony established that five years earlier Detective McCoy had had a partner with whom the juror had been romantically involved, and that McCoy had seen the juror "on occasion" when his partner picked her up after work. The former partner had been married at the time of his relationship with the juror. McCoy said that he had not seen the juror and his former partner together for two years. He also explained that during his brief trial testimony he did not see the juror sitting in the jury box until he was leaving the witness stand, at which time she "just smiled" at him. The next day, McCoy testified, the juror had called his office and asked for his former partner. When McCoy responded by asking if the jury was still deliberating, she hung up. The juror testified similarly about the circumstances under which she and McCoy were acquainted and about the phone call.

After the hearing, the juror was permitted to return to the jury room, and the jury resumed its deliberations. Counsel for both appellants moved for a mistrial, but the court denied their motions.

## II

The prosecutor's failure to name Detective McCoy as a potential government witness on the first day of *voir dire*, when the juror who knew McCoy was chosen, prejudiced appellants by preventing the free exer-

---

7. Roy left town for several days after the shooting. After he returned to the North Capitol Street neighborhood, he ran into Lyons on the street one day. Lyons gave him $1500, but neither of them said anything to the other.

8. Detective McCoy had testified very briefly at trial about a conversation he had had with Lyons in which Lyons told him that he was employed.

cise of their right of peremptory challenge. The trial court's failure to grant appellants' mistrial motion on account of this prejudice was error, and because the error was not harmless, we must reverse both appellants' convictions.

The Supreme Court said a century ago that the right to strike jurors without cause is "one of the most important rights secured to the accused.... Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Although the right of peremptory challenge is not specifically guaranteed by the Constitution,[9] it is protected in the District of Columbia by statute[10] and has long been "regarded as necessary to a fair and impartial trial." *Wells v. United States*, 515 A.2d 1108, 1110 n. 1 (D.C.1986) (citations omitted).[11] For this reason, we have repeatedly held that "[i]nterference with a defendant's exercise of peremptory challenges is *per se* grounds for reversal." *Wilson v. United States*, 606 A.2d 1017, 1025 (D.C.1992); *accord, e.g., Wells v. United States, supra*, 515 A.2d at 1111 ("the defendant need not demonstrate prejudice to obtain reversal of a conviction" (citations omitted)); *Williams v. United States*, 552 A.2d 510, 512 (D.C.1988) (same).

For example, in *Wilson, supra*, decided three days before our original opinion in this case, we found reversible error when the prosecutor had represented to the court before trial that he would not impeach the defendant with his prior convictions if the defendant testified, and then did so over defense objections. We concluded that, in these circumstances, the defendant had "missed the opportunity to use his peremptory challenges with an eye toward excluding jurors who might be particularly incensed by the nature of appellant's prior convictions...." 606 A.2d at 1026.[12] We said that the trial judge's decision to allow this impeachment "had the effect of interfering with 'the full, unrestricted exercise by the accused of that right,'" *id.* at 1025 (citing *Pointer, supra* ), "because defense counsel reasonably relied on the prosecutor's pretrial assurances that appellant would not be impeached with his prior convictions if he testified at trial to the detriment of his exercise of peremptory challenges in selecting a jury and his evaluation of whether to go to trial...." *Id.* at 1027.

In the instant case, the omission of Detective McCoy's name from the list of witnesses that the prosecutor recited on the first day of jury selection made it impossible for appellants to exercise their right of peremptory challenge against the juror who knew McCoy.[13] Appellants make no claim that the

---

9. Despite the special importance historically attached to peremptory challenges, it is settled that "peremptory challenges are not of constitutional dimension" and are but "a means to achieve the end of an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) (citations omitted); *accord, e.g., Cash v. United States*, 553 A.2d 215, 217 n. 3 (D.C.1989); *Williams v. United States*, 552 A.2d 510, 512 n. 5 (D.C.1988).

10. "An individual summoned for jury service may be ... excluded upon peremptory challenge as provided by law...." D.C.Code § 11–1908(b)(2) (1989); *see* Super.Ct.Crim.R. 24(b) (prescribing procedures for the exercise of peremptory challenges); *Taylor v. United States*, 471 A.2d 999, 1004 (D.C.1983) (rule "secures the right to challenge jurors without cause").

11. *Accord, Boertje v. United States*, 569 A.2d 586, 592 (D.C.1989) (*voir dire* of prospective jurors "serves to assure an accused, as far as possible, an impartial jury by exposing any juror biases

that might affect the verdict"); *Cash v. United States, supra* note 9, 553 A.2d at 217 ("One of the primary goals of peremptory challenges is to assure the trial's impartiality"); *Murray v. United States*, 532 A.2d 120, 123 (D.C.1987) ("The primary duty of the court in the *voir dire* is to discover those jurors who must be dismissed for cause ... and 'to permit counsel to satisfy themselves that they have an impartial jury'" (citations omitted)).

12. The prior convictions were for sodomy and indecent acts with a minor.

13. It is worth noting that appellants did not use all of their peremptory challenges, so that either of them could have struck the tainted juror if the taint had been revealed during the *voir dire*. Indeed, appellant Lyons asserts in his brief, in an argument adopted by appellant Cooper:

From the pattern of peremptory challenges exercised, it appears certain that the defense would have stricken [the juror] had they

prosecutor deliberately, or in bad faith, failed to mention McCoy's name at the critical time during the *voir dire*, nor is there any basis in the record for believing that his failure was anything other than inadvertent, as in fact he said it was. Nevertheless, the omission was his, and the government must therefore suffer the consequences on appeal. Under the law of the District of Columbia, "[i]f a defendant can show that some action by the trial court resulted in a denial or impairment of [the] right [of peremptory challenge], then the conviction must be reversed even without a showing of prejudice." *Williams, supra,* 552 A.2d at 512 (citations omitted); *accord, Wilson, supra,* 606 A.2d at 1025; *Cash, supra* note 9, 553 A.2d at 217; *Wells, supra,* 515 A.2d at 1111; *Taylor, supra* note 10, 471 A.2d at 1004; *Butler v. United States,* 377 A.2d 54, 56 (D.C.1977); *Armwood v. United States,* 373 A.2d 895, 897 n. 6 (D.C.1977).

■ The preferable cure for this violation of appellants' peremptory challenge right would have been to exclude the tainted juror from the panel before the start of jury deliberations. Unfortunately, since the judge did not learn of the connection between the juror and Detective McCoy until after deliberations had begun, the only option available to him at that point was to grant the defense motion for a mistrial. Thus we hold, as we held in our original opinion, that the denial of that motion was error.[14]

We turn to the narrow question addressed by the parties on rehearing: whether the trial court's denial of the motion for mistrial, based on the association between the juror and Detective McCoy, was or could be harm-

less error. We answer that question in the negative.

In *Arizona v. Fulminante, supra,* the Supreme Court considered whether the admission of a coerced confession might be harmless error. The Court concluded that it was, after reviewing its past decisions on the availability of a harmless error analysis with respect to other types of error. In reaching its conclusion, the Court drew a clear distinction between mere "trial errors" and errors which amount to "structural defects" in the trial itself. Discussing several cases in which it had found particular errors to be harmless, even harmless beyond a reasonable doubt,[15] the Court said:

> The common thread connecting these cases is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.

499 U.S. at 307–308, 111 S.Ct. at 1264 (Rehnquist, C.J.).[16] In contrast, the Court observed that the relatively few cases in which it had ruled that certain errors could not be harmless had involved "structural defects in the constitution of the trial mechanism," *e.g.,* deprivation of the right to counsel, trial before a biased judge, exclusion of members of the defendant's race from the grand jury, the right to self-representation, and the right to a public trial. *Id.* at 309–310, 111 S.Ct. at 1264–1265 (citing cases). Such an error can never be harmless, the Court explained, because in each instance "[t]he entire conduct of the trial from beginning to end is obvious-

---

known she was acquainted with a potential government witness. On the [first day of *voir dire*], three jurors said they recognized police officers from the group of potential government witnesses; all three were stricken—one for cause and two through peremptory challenges.

Given the record before us and this specific claim by both appellants, we cannot conclude that the defense "would not have exercised its ... peremptory challenge if this juror's recognition of [McCoy] had been disclosed during voir dire." *Shannon & Luchs Management Co. v. Roberts,* 447 A.2d 37, 44 (D.C.1982).

14. The hearing that the court conducted after learning that Detective McCoy had recognized

the juror was sufficient for the limited purpose of determining whether the telephone call between the two was evidence of the juror's bias or might have engendered bias. However, it did not focus on what we view as the crucial problem in this case: the impairment of appellants' right of peremptory challenge resulting from the belated discovery of the relationship between the juror and Detective McCoy.

15. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

16. In this portion of his opinion, Chief Justice Rehnquist was writing for a majority of the Court.

ly affected" by the error. *Id.* These latter defects are not amenable to the analysis which is engaged in to determine whether a particular "trial error" was harmless beyond a reasonable doubt because the trial " 'cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Id.* at 310, 111 S.Ct. at 1265 (quoting *Rose v. Clark,* 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986)). Thus drawing the line between "trial errors" and "structural defects," the Court concluded that the admission of a coerced confession was a "classic 'trial error,' " *id.* at 309, and that even the admission of a coerced confession might be harmless.

Following *Fulminante,* we conclude that the error which occurred in this case, the impairment of appellant's right of peremptory challenge resulting from the belated discovery of the relationship between a juror and a government witness, must be characterized as a "structural defect" rather than a "trial error." The prosecutor's omission had the effect of depriving both appellants of an opportunity to exercise a peremptory challenge that almost certainly would have been exercised. See note 13, *supra.* Unlike a mere trial error, the impact of this deprivation cannot be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless," *Fulminante, supra,* 499 U.S. at 308, 111 S.Ct. at 1264, because it affected the composition of the jury rather than the weight of the evidence. *Cf. Wilson, supra,* 606 A.2d at 1025–1026 n. 18. It therefore was not—and could not be—harmless error.

■ Because we conclude that this error was a structural defect and hence is not subject to harmless error analysis, we reject the government's corollary argument that appellants must demonstrate plain error because defense counsel failed to base their mistrial motion on the impairment of their right of peremptory challenge. Assuming the correctness of the government's premise, we are satisfied nonetheless that appellants have met their burden. Under *Fulminante,* the existence of a "structural defect" is *per se* reversible error because it taints the very fairness of the trial, and hence the reliability of the trial as a means of determining guilt or innocence. *See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error as error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial"); *cf. United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (under plain error rule, appellate court "should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings" (citation and internal punctuation omitted)). Consequently, we must reverse appellants' convictions and remand this case for a new trial.[17]

Appellant Cooper claims error in two portions of the jury instructions. In view of our reversal on other grounds, we need not consider these claims. We do, however, address certain other issues raised by both appellants, since one of them must be decided before Cooper can be retried (see note 22, *infra* ), and the others will recur in a retrial. To those issues we now turn.

### III

■ Appellants contend that the trial judge erred in admitting into evidence the

---

**17.** The government cites what it describes as "a growing body of state and federal authority ... rejecting a rule of *per se* reversal" unless there was actual juror bias. In light of our own cases such as *Wells* and *Wilson,* however, we are not free to follow this body of authority. Our cases make clear that any infringement of the right of peremptory challenge "is *per se* grounds for reversal" without any showing of prejudice. *Wilson, supra,* 606 A.2d at 1025. Although the government argues forcefully that appellants suffered no prejudice and that the juror in this case was not biased, that argument is really beside the point because, ultimately, juror bias is not the issue.

Our decision in *Harris v. United States,* 606 A.2d 763 (D.C.1992), on which the government also relies, is inapposite here because it involved only a claim that the trial judge had violated the defendant's due process rights by refusing to strike a juror for cause. No issue was raised regarding any possible abridgment of the defendant's right of peremptory challenge.

decedent's statement that "T–Bone told them to shoot me." [18] The judge ruled that the statement was admissible under the spontaneous utterance and dying declaration exceptions to the hearsay rule. This ruling was correct on both grounds.

■ There are three prerequisites to the admission of a statement under the spontaneous utterance exception to the hearsay rule: (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark. *Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977) (citation omitted). The admissibility of a spontaneous utterance "is committed to the sound judicial discretion of the trial court. We will reverse on appeal only if a ruling is clearly erroneous." *Alston v. United States*, 462 A.2d 1122, 1128 (D.C. 1983) (citations omitted). Appellants claim that Royster's statement about T–Bone was not a spontaneous utterance because Royster "had time to reflect, premeditate, and construct" it. We are satisfied that the statement met all three requirements for admission as a spontaneous utterance.

First of all, the shooting was a "serious occurrence" that produced a state of "physical shock" in Royster. Karen Flaherty testified that when she came to Royster's assistance, he was groaning and in pain. She saw that he had been shot in the chest, and that although the wound "wasn't bleeding a lot outside ... it was a good hole there." This injury plainly fits within the types of situations which this court has recognized as "serious occurrences." *See Gayden v. United States*, 584 A.2d 578, 585 (D.C.1990) (admission of spontaneous utterance upheld when the declarant had been shot six times and was "rolling on a doorstep in extreme pain"),

*cert. denied,* ___ U.S. ___, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *Young v. United States,* 391 A.2d 248, 250 (D.C.1978) (declarant had been stabbed and was bleeding profusely); *Nicholson v. United States, supra,* 368 A.2d at 564 (declarant had been stabbed thirty minutes before making statement). Second, Ms. Flaherty stated that no more than ten minutes passed between the firing of the shots and Royster's statement; thus the statement came "within a reasonably short period" after the shooting. *See Alston v. United States, supra,* 462 A.2d at 1127 ("when the utterance is made immediately after the disturbing incident ... or a few minutes after the incident," it fits within the spontaneous utterance exception) (citations omitted)). Finally, the circumstances "in their totality suggest spontaneity and sincerity." Contrary to Lyons' assertion, there was no significant interval in which Royster "was fully conscious" and "had time to think and speculate." Rather, the testimony showed that in the short time between being shot and making the statement Royster was in great pain, and that his condition was quickly deteriorating. The fact that Royster made the statement in response to a question from Ms. Flaherty is not proof that he reflected before speaking. *Young v. United States, supra,* 391 A.2d at 250.

■ It also was not erroneous for the trial court to admit the statement under the dying declaration exception to the hearsay rule. "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States,* 290 U.S. 96, 99, 54 S.Ct. 22, 23, 78 L.Ed. 196 (1933). The record supports the trial court's conclusion, well founded in the evidence, that Royster realized his "extreme circumstances even though [he did not] articulate" them. *See McFadden v. United States,* 395 A.2d 14, 16 (D.C. 1978) ("The court can infer the victim's sense of impending death from the circumstances— from the nature and extent of his wounds").[19]

---

18. "T–Bone" is the nickname of appellant Lyons. The statement was heard by Karen Flaherty, a woman who worked near the scene of the shoot-

ing and came to Royster's assistance after he was shot.

19. The Supreme Court said in *Shepard, supra,* that the perception of impending death "must be

For these reasons, we find no error in the admission of Royster's statement.

## IV

■ Appellants argue that they were substantially prejudiced because the trial judge refused to permit two of the government's witnesses to invoke their Fifth Amendment privilege against self-incrimination. The judge found that both witnesses had waived the privilege by testifying before the grand jury. Appellants acknowledge the rule that a defendant in a criminal proceeding normally does not have standing to assert the constitutional rights of others. *Alderman v. United States*, 394 U.S. 165, 171–176, 89 S.Ct. 961, 965–968, 22 L.Ed.2d 176 (1969). More specifically, a defendant does not have standing to complain of an erroneous ruling on a witness' claim of privilege. *Long v. United States*, 124 U.S.App.D.C. 14, 19, 360 F.2d 829, 834 (1966) (citing *Bowman v. United States*, 350 F.2d 913, 916 (9th Cir.1965) ("Where the witness is not the party, the party may not claim the privilege nor take advantage of an error of the court in overruling it"), *cert. denied*, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966)). Appellants argue, however, that this case fits within the exception to this principle announced in *Ellis v. United States*, 135 U.S.App.D.C. 35, 416 F.2d 791 (1969).

In *Ellis* the court held:

[A] witness who voluntarily testifies before a grand jury without invoking the privilege against self-incrimination, of which he has been advised, waives the privilege and may not thereafter claim it when he is called to testify as a witness at the trial on the indictment returned by the grand jury, where the witness is not the defendant, or under indictment.

*Id.* at 44, 416 F.2d at 800; *accord, Salim v. United States*, 480 A.2d 710, 714 (D.C.1984). The *Ellis* court also recognized, however, that when a judge erroneously rejects a witness' claim of privilege, " 'the reasons which underlie our rule denying standing to raise another's rights ... are outweighed by the need to protect ... fundamental rights....' " 135 U.S.App.D.C. at 43, 416 F.2d at 799 (quoting *Barrows v. Jackson*, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953)). "[A] defendant adversely affected in fact has standing to bring such departure from the judicial province to the appellate court for review and correction." *Ellis, supra*, 135 U.S.App.D.C. at 44, 416 F.2d at 800.

We hold that the *Ellis* exception to the no-standing rule of *Alderman* and *Long* is inapplicable in the instant case because there was no erroneous ruling on the Fifth Amendment waiver issue. The trial judge conducted a lengthy *voir dire* of the two witnesses in question and reviewed their grand jury testimony in order to determine the validity and scope of their waivers.[20] He then made specific findings of fact and ruled that each of them had knowingly and voluntarily waived his privilege. Because that ruling is amply supported by the evidence, we can find no error in the judge's refusal to sustain the witnesses' claim of privilege at trial. The *Ellis* exception therefore does not apply.

## V

■ Lyons argues that his Sixth Amendment right to a speedy trial was violated by the fifteen-month delay between his arrest and the start of the trial. He claims that

---

exhibited in the evidence, and not left to conjecture." 290 U.S. at 100, 54 S.Ct. at 24. Of particular relevance on this point was testimony about Royster's own awareness of his condition. When Ms. Flaherty first approached him, a police officer was already on the scene, and they both attempted to move Royster. Flaherty testified, "When we talked to him about moving, he kind of went 'Oh, no,' " and he groaned. The officer testified that Royster said, "Don't move me. I have been shot too many times."

20. In deciding whether a witness who has testified before the grand jury may later assert a Fifth

Amendment privilege at trial, "a proper consideration of all the circumstances require[s] the trial judge to examine the grand jury testimony and to conduct a voir dire of the [witness] outside the presence of the jury." *Salim v. United States, supra*, 480 A.2d at 715. "In evaluating the validity of a witness' claim of the Fifth Amendment privilege, the trial court must determine, from all the circumstances, whether the claimant has reasonable cause to apprehend a real danger of prosecution." *Reese v. United States*, 467 A.2d 152, 156–157 (D.C.1983).

was prejudiced by this delay because someone named "Chester" had died "while the case was pending." Lyons asserts that Chester would have rebutted the testimony of three government witnesses who testified about certain incriminating statements he had made.

▆ Because the delay was more than a year, the speedy trial claim has *prima facie* merit so as to trigger an inquiry into the other relevant factors: the reasons for the delay, the defendant's assertion of his Sixth Amendment right, and—most importantly— prejudice to the defense. *See, e.g., Tribble v. United States*, 447 A.2d 766, 768 (D.C.1982). Nine of the fifteen months were consumed by the presentation of the case to the grand jury. This type of "investigative delay" has been characterized as "fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused." *Tolliver v. United States*, 378 A.2d 679, 681 (D.C.1977). Moreover, "[a]n immediate ... indictment might impair the prosecutor's ability to continue the investigation or obtain additional indictments...." *Id.* The record plainly shows that this was a difficult and complex case (the trial lasted three weeks and involved twenty-five witnesses), and there is nothing to indicate that the government dragged its feet in conducting the grand jury proceedings. To the contrary, the trial judge stated that before the filing of the indictment he had called upon the prosecutor "to make periodic justifications for that grand jury delay, and I found each time he did so ... that he had demonstrated justification in some sense for the delay." The judge further characterized the delay from indictment to trial as "regrettable," but there is ample authority that such delay, while chargeable to the government, is considered more "neutral" and is "weighted less heavily" against the government. *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

Lyons was arrested in this case on June 17, 1987, and the next day he was ordered held on a $25,000 surety bond. On June 24 he filed a motion for review of conditions of release in which he "request[ed] a speedy

trial" and, in one conclusory sentence, asserted "continuing prejudice to himself and his defense because of his incarceration." After gaining his release on July 21, however, he did not say anything more about a speedy trial until almost a year later, in a motion to dismiss for lack of a speedy trial filed July 15, 1988. The trial judge found it "most telling [that] once Mr. Lyons got out, there were no subsequent assertions [of his Sixth Amendment right] until the eve of trial."[21] He therefore declined to give "strong evidentiary weight" to this factor, and so do we, particularly in light of Lyons' failure to move for a prompt trial as an alternative to dismissal. *See Graves v. United States*, 490 A.2d 1086, 1098–1101 (D.C.1984) (en banc), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

Finally, we can discern no prejudice to the defense resulting from the pre-trial delay. Lyons has not shown how the death of Chester prejudiced his defense, nor can we identify any prejudice from the record. *See Parks v. United States*, 451 A.2d 591, 600 (D.C. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). There is no evidence indicating who Chester was, when he died, or what his testimony would have been. Thus it is unclear whether the pre-trial delay in fact prevented Chester from testifying. There is also no proffer of how Chester would have rebutted the testimony of any government witnesses. Lyons did not suffer oppressive pre-trial incarceration; he was in jail for only thirty-four days out of the fifteen months between his arrest and the start of the trial. Given the vagueness of his claim of prejudice, the lack of any prejudice revealed by the record, and Lyons' relatively brief confinement, we hold that the trial court did not err in denying his motion to dismiss for lack of a speedy trial.

## VI

▆ Finally, appellant Cooper challenges the sufficiency of the evidence to support her murder conviction as an aider and abettor. In considering any claim of evidentiary insufficiency, we must view the evi-

---

21. Appellants' trial began on September 8, 1988.

dence in the light most favorable to the government, bearing in mind the jury's right to determine the credibility of witnesses and draw reasonable inferences from the evidence. *United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978) (citing cases). We recognize no distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C. 1978) (citing cases); *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954). Applying these venerable principles to the case at bar, we hold that the evidence was sufficient to prove beyond a reasonable doubt that Cooper was guilty of murder.[22]

"One who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.'" *West v. United States*, 499 A.2d 860, 865 (D.C.1985) (citation omitted). "[P]roof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation in the crime as an aider and abettor." *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983) (citation omitted).

The evidence showed that Cooper and Lyons shared a common purpose: to kill Royster in retaliation for stealing cocaine from them and their sellers. In the two months before the shooting, Cooper twice threatened Royster, saying that she would "pay somebody to kill" him and would "shoot [him] now" for having stolen cocaine. Five days before Royster's shooting, Cooper told Larry Jackson, a friend of Royster, that "we" would shoot Royster if he came back to the

North Capitol Street neighborhood. On the day of the shooting, a witness saw Cooper walking along the street, saying to herself that she was "tired of this shit." Minutes later the same witness saw Roy, Cooper, and Lyons together, and he heard Cooper and Lyons arguing with Royster. In Cooper's presence, Lyons said to Royster, "I'm tired of this shit and it's ending now."[23] Roy shot Royster very soon after this argument took place. In the interim, Roy told Derrick Wimple to "go get the pistol," and he saw Wimple receive the gun from Cooper. The jury could reasonably infer that when Cooper handed Wimple the gun, she knew that Roy intended to shoot Royster. With that knowledge, she also took the gun back after Royster had been shot. From all of this evidence—most significantly, from the fact that she furnished the murder weapon to the triggerman—a jury could readily find that she aided and abetted the murder.

## VII

The convictions of both appellants are reversed, and this case is remanded for a new trial.

*Reversed and remanded.*

KERN, Senior Judge, concurring:

Given the particular circumstances of this case, I agree with the majority's conclusion that we must reverse appellants' convictions and remand for a new trial.

The record reflects an unusual situation in this case. Jury selection extended over two days and required two venires. During the first day, nine jurors were selected. On the second day, three jurors and three alternates were chosen. On each day, the venire was involved in a *voir dire.* Counsel for the parties identified, in person or by name, the witnesses they expected to call during the course of the trial. On the first day of jury

22. We are obliged to address Cooper's sufficiency argument because, if the evidence were insufficient, the Double Jeopardy Clause of the Fifth Amendment would bar her retrial. *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984); *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150–2151, 57 L.Ed.2d 1 (1978).

23. A reasonable juror could infer, from all the evidence, that what Cooper and Lyons were both "tired of" was the difficulties with Royster. Lyons' statement that "it's ending now" bespeaks an intention to bring the matter to an end; a reasonable juror could infer that the shooting was the planned means of doing so, and that Cooper shared in that plan.

selection, the prosecutor identified forty-two witnesses. On the second day, the prosecutor identified forty-six witnesses, one of whom was Detective McCoy. At the end of trial during jury deliberation a juror who had been chosen during the first day, and was in a separate room during the *voir dire* of the second day, was discovered to have known Detective McCoy. The record reflects that during the two days of juror selection three members of the venires had identified a prosecution witness. The court struck one of these potential jurors for cause. The defendants used their peremptory challenges to strike the other two.

I am troubled by the majority's analysis of the issue: how to deal with the *inadvertent* failure by the prosecutor to list all the witnesses for the government to the particular venire panel from which the juror in question was chosen to serve and this juror's romantic involvement with the former police partner of one such "unlisted" witness coming to light only after the jury commenced its deliberation. The majority citing to the Supreme Court's decision in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), characterizes this error as a "structural defect," thereby creating a *per se* rule for reversal of all future convictions in which the failure to list all witnesses to the venire panel occurs. I cannot agree. I view this case not only as unusual, but as one falling between the "classic trial error" and "structural defect" categories adopted in *Fulminante.* In my view, the government's wholly inadvertent failure to list all witnesses to all potential jurors requires a very fact-specific and individualized approach, analyzing the juror/witness relationship from an appearance of bias rather than a "structural defect" perspective.

Thus, I would approach this case by noting that during the trial, one of the four witnesses who had not been identified to all the

jurors as a potential witness, Detective McCoy, testified. Upon leaving the stand, he recognized one of the jurors who smiled at him. The next day the juror called Detective McCoy's office to speak with his former partner. When Detective McCoy asked if the jury was still deliberating, the juror hung up. Later, Detective McCoy contacted the prosecutor, who notified the court. At the hearing held by the trial court concerning this development it was discovered that the juror had been romantically involved with a police officer who was Detective McCoy's former partner and consequently knew McCoy.

As the majority points out, "The preferable cure for this violation of appellants' peremptory challenge right would have been to exclude the tainted juror from the panel before the start of jury deliberations." Majority op. at 9. Unfortunately, the problem did not come to light until the jury had begun its deliberations, when the juror in question took the very unique step of telephoning Detective McCoy's office to ascertain how she could contact his former partner. Normally, a juror's knowledge of a witness would be revealed during the *voir dire,* the course of the trial, or would go totally undetected. If a juror's knowledge of a witness is discovered during the *voir dire,* the juror is either struck by the court for cause, eliminated through the use of peremptory challenge by a party, or allowed by the judge and parties to serve on the jury.[1] When a witness who was not initially introduced to the venire testifies at trial, the court often asks the jury whether they know the newly announced witness. If a juror identifies the new witness, the court holds a hearing to determine if the juror should be struck from the jury at that time or be allowed to continue as a juror. Thus, this case is a very unusual one where the court discovers that a juror knows a witness after all the evidence has been presented, the court has charged the jury, and the jury has initiated its deliberations.

---

1. Neither the juror nor the witness notified the court of their association during the day the witness testified. In the future, a court might avoid this situation by instructing the jury that if they identify any witness during the course of trial, they should notify the court. In this case, the witness, who recognized the juror, might have been instructed to inform the court of any

relationship with a juror. However, it is more practical and more closely follows the policies behind the venire's pre-trial *voir dire* to instruct the jury once, prior to the beginning of the trial, than to instruct forty-six or more witnesses separately on the need to identify any juror they may be familiar with.

Given this unique situation, it is appropriate to examine what role a peremptory challenge plays in a trial. Peremptory challenges help secure a trial's impartiality and "are viewed as 'one of the most important rights secured to the accused.'" *Wells v. United States*, 515 A.2d 1108, 1111 (D.C. 1986) (quoting *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894)). "Hence, where the trial judge frustrates the defendant's 'effective use' of peremptory challenges, the defendant need not demonstrate prejudice to obtain reversal of a conviction." *Id.* The use of peremptory challenges does not assure an impartial trial by eliminating jurors with bias. A juror with bias is eliminated for cause by the court. Rather, peremptory challenges are often used by a party to eliminate a juror for the appearance of bias. *See Williams v. United States*, 552 A.2d 510 (D.C.1988). Thus, this case involves the inadvertent, but real, deprivation of the defendant's ability to utilize a peremptory challenge to eliminate a potential juror for the appearance of bias: knowing a prosecution witness by reason of having an intimate relationship with his one-time police partner.

In *Wilson v. United States*, 606 A.2d 1017 (D.C.1992), we found reversible error when defendant relied upon the prosecutor's representation that he would not impeach the defendant with his prior convictions, and then impeached the defendant with those prior convictions during the trial. We concluded that the defendant had "missed the opportunity to use his peremptory challenges with an eye toward excluding jurors who might be particularly incensed by the nature of [defendant's] prior convictions." *Id.* at 1026. We recognized that "picking a jury has developed into an art form" and the mid-trial change of impeachment strategy interfered with the defendant's exercise of peremptory challenges and jury strategy. *Id.* at 1025.

However, we do not have the *Wilson* situation here. In this case there was no change of prosecution strategy. Rather, there was a

prosecution mistake that if caught earlier could have been remedied by discharging the juror and selecting an alternate to take her place. At the same time, this is not a case where the juror concealed from the court his or her knowledge of a witness or other similarly significant fact involving potential bias. *See Harris v. United States*, 606 A.2d 763 (D.C.1992) (juror failed to notify that son had been convicted of a crime despite court's *voir dire* question); *Shannon & Luchs Management Co. v. Roberts*, 447 A.2d 37 (D.C.1982) (juror failed to recognize witness at *voir dire*, but during trial recognized witness). In this case, the juror was not even present when the prosecutor listed the witnesses and so could not be deemed to have misled the court during the *voir dire*. I agree that the harmless error analysis in *Harris* and *Shannon & Luchs* is not applicable here given the particular circumstances of the failure by the prosecutor and the court to note that the witness McCoy was never identified to nine of the jurors.

However, I do not agree with the majority's classification of this error as a "structural defect" under the *Fulminante, supra*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, decision. In *Fulminante*, Chief Justice Rehnquist, speaking for the majority, described "structural defects" as affecting "the entire conduct of the trial from beginning to end. . . ." *Id.* at 309, 111 S.Ct. at 1265. Structural defects include the absence of defense counsel or an impartial judge. *Id.* Structural defect cases are *per se* reversible. The Court went on to classify other type of cases—those in which the court applies a harmless-error analysis—as "trial error" cases. That is, "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307–08, 111 S.Ct. at 1264.

This case, in my view, is neither a "structural defect" nor a "trial error" case.[2] It is

---

**2.** Based on the Supreme Court's decision in *Fulminante*, the *Wilson* case might best be described as a "structural defect" case since the prosecutor's promise not to impeach the defendant with

his prior convictions, and later recantation, infected the entire trial process. 606 A.2d 1017. The *Harris* case, involving potential juror bias, may also be described as a "structural defect"

not a structural defect, because it can be corrected up until the beginning of the jury's deliberation and does not infect the entire trial. Unlike the cases involving the impartial judge or the absence of a defense attorney from the trial, the failure to identify a witness, in order to discover whether a juror knows the witness, is an error that can be corrected during the trial by asking the jurors whether they know the witness and by eliminating the jurors who have an appearance of bias.

Also, this case cannot be classified as a "trial error" case. It does not involve evidence presented in the case or other trial error which can be "assessed in the context of other evidence presented." *Id.* 499 U.S. at 308, 111 S.Ct. at 1264. The present case, in my view, falls between a "structural defect" case and a "trial error" case, akin to the so-called intermediate scrutiny cases involving gender discrimination requiring an analysis somewhere between strict scrutiny and rational basis. *See Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).

I urge this court to adopt an analysis based on the fact-specific circumstances of the potential appearance of bias. In this case, the juror had entered into a serious romance with a police officer who was a partner of this witness. In addition, the witness was a police officer rather than a civilian, and a phone conversation between the juror and the witness took place during the jury's deliberation at the conclusion of the trial. This is not a situation where the juror recognizes the witness upon the basis of one meeting at a party or in a store; rather, it is the situation where the witness was at one time the partner of the juror's friend.

Although the trial court determined after a special *voir dire* that the juror was not biased against the defendant, the trial court did not address the appearance of bias caused by the unique circumstances. Peremptory challenges help guarantee the right to a fair trial by excluding jurors who have an appearance of bias. It certainly was not unreasonable for the defendant to feel that the juror presented the appearance of bias. After all, she had been romantically involved with a police officer whose former partner testified for the prosecution. Had this information been available to defense counsel during the *voir dire,* it is reasonable to conclude that the defense, because of the circumstances, would have struck the juror. The prosecutor's failure to list a witness deprived the defendants of their right to a fair trial through the effective use of their peremptory challenges.

Under the majority's analysis, if it is discovered after the innocent failure to list a witness that the juror knows the witness through a friend of a friend of a friend, and the witness is not a police officer or an otherwise essential witness, the defendant is nevertheless entitled to an automatic reversal because of the inadvertent failure to list such witness. I would certainly be hesitant to reverse other convictions in the future once the jury has initiated or concluded deliberations, where the juror knows a hitherto unlisted prosecution witness who is not a law enforcement official, when the relationship is obscure, and the witness has a limited impact

---

case. 606 A.2d 763. However, the *Harris* opinion treated a juror's failure to answer a *voir dire* question under an actual bias analysis rather than as *per se* reversible error. *Williams* also appears to be a "structural defect" case in which the court found no error. 552 A.2d 510. The *Williams* court concluded that a less than desirable peremptory challenge procedure was not reversible error since the effect on the jury and the defendant's peremptory challenge choices would have been the same under a proper procedure. Finally, *Wells* appears to be a "structural defect" decision since the peremptory procedure frustrated the defendant's effective use of the challenges. 515 A.2d 1108. None of these cases could possibly be classified as a trial error case,

since no "trial error" such as those listed in *Fulminante* ever occurred.

Rather than following the "structural defect" versus "trial error" analysis, I would explain these five decisions by analyzing who caused the problem—the government, judge, or juror—and the individual circumstances of each case. I do not feel that all five cases fit neatly into the "structural defect" or "trial error" boxes, but, unfortunately for the future, the majority feels compelled to adopt such an analysis. Yet under such an analysis, these five "structural defect" cases did not result in *per se* reversals. Rather, the individual circumstances were evaluated and a case-by-case approach yielded differing decisions.

on the prosecution case. In such a case, the appearance of bias is *de minimis.*

In sum, I conclude that we are required to reverse the convictions because the appearance of bias is quite substantial under the particular circumstances, *viz.,* the government's mistake in failing to identify the witness during the *voir dire* prevented the defense from being able to fully exercise their peremptory challenges. In the future, if there is a failure to identify witnesses such as occurred here, the trial court should evaluate the juror/witness relationship from the perspective of an appearance of bias as well as an actual bias perspective. If the relationship is such that the appearance of bias is high, the juror should be struck from the jury and replaced by an alternate. If deliberations have begun, a mistrial should be declared. If the appearance of bias is low, the trial should continue without dismissing the juror or ordering a mistrial. I would avoid a *per se* rule which the majority adopts—with serious consequences for the future.