Bertrand D. DICKERSON, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–850.

District of Columbia Court of Appeals.

Argued Dec. 5, 1991.
Decided Nov. 29, 1994.

Robert J. Pleshaw, appointed by this court, Washington, DC, for appellant.

Douglas K. Klein, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Oscar S. Mayers, Jr., Asst. U.S. Attys., Washington, DC, were on the brief, *for* appellee.

Before WAGNER, Chief Judge,* SCHWELB, Associate Judge, and GALLAGHER, Senior Judge.

WAGNER, Chief Judge:

Appellant, Bertrand D. Dickerson, was convicted following a jury trial of possession of a controlled substance (cocaine) with intent to distribute in violation of D.C.Code § 33–541(a)(1) (1981 ed.) (Repl.1993). He argues for reversal on the grounds that: (1) the evidence was insufficient to convict him; (2) the trial court erred in instructing the jury on aiding and abetting; and (3) he was denied the right to a speedy trial. We affirm.

## I.

According to the evidence presented by the government, on May 3, 1988, at about 5:00 p.m., on the corner of 18th Place and D Street, N.E., an undercover police officer purchased cocaine from Dickerson's co-defendant, Derrick Snipe, in exchange for twenty dollars in pre-recorded police funds. The undercover officer returned to a vehicle from which another officer, Kim Holland, was observing the events. Officer Holland gave the

* *Judge* WAGNER was an *Associate Judge* of this court at the time of argument. Her status changed to *Chief Judge* on June 14, 1994.

location of the transaction and a description of the drug-seller to an arrest team. Officer Holland then saw Snipe walk east on D Street and enter the right rear passenger seat of a grey Nissan Maxima in which three other men were seated. Inside the vehicle, she saw Snipe reach forward while the two men in the front (one of whom was Dickerson) turned toward Snipe, but she could not tell whether Snipe was "passing or receiving." Officer Holland broadcast these observations to the arrest team. Another officer saw Charles Smith exit the car from the driver's side, appellant, from the right front passenger side, Snipe, from the right rear passenger side, and Walter Tucker, from the left rear passenger side.

The police arrested Snipe while he stood outside of the back of the car approximately three feet from the vehicle, and they found there on the ground, in front of appellant's residence, a napkin containing eighty-three rocks of cocaine. Another officer arrested Smith after he saw him walk to the back of the car and drop a pill bottle. The bottle contained thirteen rocks of cocaine and had appellant's name and address on it. After arresting Smith, Tucker, and Snipe, the police recovered $642 from the console between the front seats of the Maxima, including the twenty dollars in pre-recorded police funds which the undercover officer had used to make the purchase. Dickerson, who by then was sitting on the steps of his house, was arrested. Dickerson, Snipe, and Smith were indicted for possession with intent to distribute a controlled substance.[1]

After pleading guilty to attempted distribution of cocaine, Snipe testified as a defense witness at appellant's trial. He testified that although he knew Smith and Tucker, he had never seen appellant prior to the day of the offense. Snipe also testified that he heard Smith ask appellant for a bottle, but he left and sold the drugs he had obtained from Smith to an undercover officer for twenty dollars.[2] He then returned to Smith's car where all of the co-defendants were sitting and handed Smith the twenty dollars, which he put in his pocket. Snipe said appellant then left Smith's car, and the police arrived. During direct examination Snipe testified that appellant left the car as soon as Snipe was getting into the car after the drug transaction. On cross-examination, however, Snipe stated that appellant was in the car when he handed Smith the twenty dollars. Snipe further testified that he never saw appellant in possession of the pill bottle or any money and that appellant did not appear to be involved in the drug transactions.

Appellant testified that he arrived home from work at about 5:00 p.m. and encountered Smith, whom he knew from elementary school and as a boxing partner, near his house. According to appellant, Smith gave him money to buy chicken and asked him for a container. Appellant testified that, without inquiring about Smith's purpose, he gave Smith an empty pill bottle that once contained prescription medication. When he returned from Kentucky Fried Chicken, appellant said he got into Smith's car, and the two of them ate the chicken. Although Tucker, whom appellant also knew from school, approached Smith's car, according to appellant, Tucker never sat in the car. Appellant testified that he did not know Snipe, who entered Smith's car. Appellant then left the car.

Appellant testified that while sitting on his steps thereafter, he heard Tucker say "the jump-outs are up the street." Appellant said he saw two police officers at the corner of Eighteenth Place and D Street wrestling with another individual and an unmarked police cruiser coming down the street heading toward Smith's car. He testified that Smith, Tucker, and Snipe got out of the car and that Smith attempted to cut between the rear of his car and another parked car and dropped the pill bottle.

According to appellant, an officer searched Smith's car and recovered a substantial amount of cash from the area between the driver's and passenger's front seat. Appellant testified that after the officers arrested Snipe, Smith, and Tucker, an officer returned to the area around Smith's car, went to the base of the lamp post, and retrieved drugs.

1. Smith and Snipe were also indicted for distribution of a controlled substance.

2. In return for selling drugs for Smith, according to Snipe, he received drugs for his personal use.

After about ten minutes, according to appellant, Officer Pender picked up from the ground the pill bottle containing appellant's name and address which Smith had dropped. Officer Pender asked appellant for identification, and then arrested him.

Appellant denied ever using, selling or possessing drugs, or seeing Tucker, Smith, or Snipe possess drugs on May 3, 1988. He denied that there was any conversation about drugs while he sat in Smith's car. Appellant also denied knowledge of the stash at the lamp post and in the pill bottle.

## II.

Appellant argues that the evidence was insufficient to establish that he actually or constructively possessed any of the drugs recovered, that he intended to possess the drugs, or that he even had knowledge of their existence. In determining the sufficiency of the evidence, this court applies the same standard as the trial court. We view the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony. *Leonard v. United States,* 602 A.2d 1112, 1114 (D.C.1992) (citations omitted); *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991); *In re A.B.,* 556 A.2d 645, 649 n. 8 (D.C.1989) (quoting *Ford v. United States,* 498 A.2d 1135, 1137 (D.C.1985)); *accord, Head v. United States,* 451 A.2d 615, 622 (D.C.1982), *cert. denied,* — U.S. —, 115 S.Ct. 156, 130 L.Ed.2d 95 (1994). No distinction is drawn between direct and circumstantial evidence, *id.,* and the evidence need not compel a finding of guilt beyond a reasonable doubt. *In re T.M.,* 577 A.2d 1149, 1151 (D.C.1990); *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). "[T]he government is not required to negate every possible inference of innocence." *Jones v. United States,* 625 A.2d 281, 288 (D.C.1993). When the defendant introduces evidence after the government's case in chief, this court may consider all of the evidence when determining the sufficiency of the evidence. *Hairston v. United States,* 497 A.2d 1097, 1104 n. 12 (D.C.1985).

Viewing the evidence, both direct and circumstantial, against these standards, we conclude that the evidence was adequate to support the jury's finding that appellant jointly and constructively possessed the drugs. *See Bernard v. United States,* 575 A.2d 1191, 1195–96 (D.C.1990); *Curry, supra,* 520 A.2d at 263. First, there was evidence that a substantial amount of drugs was in a bottle bearing appellant Dickerson's name and address. In addition, there was evidence that after making a drug sale, Snipe joined Dickerson and Smith in a car and reached into the area of the console from which a large amount of money was recovered. The funds recovered from that area included the money used by the police to make the drug purchase. Snipe, who was a witness for Dickerson at trial,[3] admitted that he and Tucker were selling crack for Smith and that appellant Dickerson was present when he gave Smith the money for the drugs which he sold to the undercover officer. The remaining drugs were found outside of the car from which Dickerson and the others had just exited and directly in front of Dickerson's residence.

It was within the province of the jury to reject, as it apparently did, appellant's innocent explanation for the transfer and use of his bottle and his innocent presence defense. We conclude that there was sufficient evidence for the jury to infer that there was a concert of illegal action involving the drugs by Dickerson and his companions, the disclaimer of appellant and Snipe notwithstanding. Such evidence "tend[s] to dispel any fear that the 'constructive possession' doctrine has cast too wide a net."[4] *See Wheeler v. United States,* 494 A.2d 170, 173 (D.C. 1985). *See also United States v. Covington,* 459 A.2d 1067, 1071 (D.C.1983).

3. Snipe pleaded guilty prior to Dickerson's trial.

4. We also reject appellant's argument that the trial court committed reversible, plain error in instructing the jury on aiding and abetting as there was evidence to support it. *See Head, supra,* 451 A.2d at 626; *see also United States v. Staten,* 189 U.S.App.D.C. 100, 108, 581 F.2d 878, 884 (1978).

### III.

Appellant also argues for the first time on appeal that his right to a speedy trial was violated by a twenty-four month delay between his initial arrest and the commencement of his trial. Appellant claims he was prejudiced by the delay because by the time of trial he had turned twenty-two years of age, and therefore was ineligible for sentencing under the Youth Rehabilitation Act (YRA), D.C.Code §§ 24-801-807 (1981 ed.) (Repl.1989). This court must consider the well-established multi-factor balancing test in analyzing appellant's speedy trial claim: (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *Lyons v. United States,* 645 A.2d 574 (D.C.1994). None of these factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," and the court must undertake a sensitive balancing process of all four factors in order to reach its decision. *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193.

The record reflects that appellant was arrested on May 3, 1988. The original indictment was dismissed for want of prosecution on September 13, 1988, and appellant was not re-indicted until January 11, 1989. The period between the dismissal and re-indictment is not considered when evaluating the Sixth Amendment speedy trial claim.[5] *United States v. Loud Hawk,* 474 U.S. 302, 310-12, 106 S.Ct. 648, 653-55, 88 L.Ed.2d 640 (1985); *MacDonald, supra* note 5, 456 U.S. at 7-9, 102 S.Ct. at 1501-02; *accord, United States v. Koller,* 956 F.2d 1408, 1413 (7th Cir.1992). Therefore, the total delay for purposes of our analysis is twenty months. While a twenty-month delay is substantial, this court has held that delays of that length and even longer do not, standing alone, constitute a violation of the right to a speedy trial. *See, e.g., Graves v. United States,* 490 A.2d 1086, 1090 (D.C.1984) (en banc) (25 months), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986); *(Ulysses) Jones v. United States,* 483 A.2d 1149 (D.C. 1984) (34 months), *cert. denied,* 471 U.S. 1118, 105 S.Ct. 2363, 86 L.Ed.2d 263 (1985); *Cates v. United States,* 379 A.2d 968, 970 (D.C.1977) (59 months).

With respect to the second factor in this analysis, the reasons for the delay, this court applies different weights depending upon the basis for it.

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192. This court has created an intermediate category of significant delay which is applied to government actions less culpable than deliberate foot-dragging, but more culpable than the neutral category. *Graves, supra,* 490 A.2d at 1092.

In this case, forty-four days are attributable to the government's negligence in losing its file, and eighty-five days are attributable to the government's requests for continuances of two scheduled trial dates because of committed leave of its various witnesses.[6] At least four months of delay, from September 5, 1989 through January 24, 1990,

5. Such delay is addressed under the Due Process Clause or any statute of limitations. *See United States v. MacDonald,* 456 U.S. 1, 7-9, 102 S.Ct. 1497, 1501-02, 71 L.Ed.2d 696 (1982). The period of dismissal at the early stages of the proceedings in this case resulting from the government's inability to locate its file does not rise to the level of a due process violation.

6. The government has calculated the period of its request for continuances from April 27, 1989 to September 5, 1989. However, the first scheduled trial date for which it sought a continuance was set by the court on February 28, 1989 to be held on June 12, 1989. The interim between those two dates should be attributed to institutional delay. Even assuming that time were counted in the way the government did in its brief, the difference would be minimal, and our result would be the same.

are attributable to counsel for co-defendant.[7] The forty-four days of delay between August 1, 1988 and the dismissal of the case on September 13, 1988 are weighed against the government as significant, but less heavily than where the government delays deliberately to gain some tactical advantage. *See id.* at 1092–93. The remaining delay was institutional, which is weighed less heavily against the government. *Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192; *Graves, supra,* 490 A.2d at 1094. Therefore, the only "significant" delay attributable to the government occurred very early in the case. The rest of the delay was for neutral, institutional reasons, and none of the delay appears to be attributable to a deliberate attempt by the government to gain a tactical advantage.

The third factor is assertion of the right. "The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Sell v. United States,* 525 A.2d 1017, 1023 (D.C.1987) (quoting *Barker, supra,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93). The "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193. Although not dependent on particular language, we have consistently stressed the importance of a direct assertion of the right, emphasizing that the assertion has more credence when a speedy trial is requested directly. *E.g., Turner v. United States,* 622 A.2d 667, 678 (D.C.1993); *Lyons, supra,* 645 A.2d at 583; *Graves, supra,* 490 A.2d at 1098; *Sell,* 525 A.2d at 1024–25. In evaluating this factor, we "weigh the frequency and force of the objections as opposed to attaching significant weight to a purely *pro forma* objection." *Barker,* 407 U.S. at 529, 92 S.Ct. at 2191; *e.g., Graves,* 490 A.2d at 1090; *Sell,* 525 A.2d at 1025; *Jackson v. United States,* 503 A.2d 1225, 1228 (D.C.1986).

Appellant concedes that he never asserted his right to a speedy trial in the trial court. Thus, this factor weighs heavily against him. Although appellant twice moved to sever his trial from his co-defendants (on March 3 and August 2, 1989) on the ground that the evidence against him was weaker than that against his co-defendants, and twice opposed the government's motions for continuance of trial dates (on April 27 and July 20, 1989), he never moved for an immediate trial. On the April date, appellant merely stated that he was "anxious to resolve this case." It was not until July when he filed the same objection that he finally apprised the court about the imminence of his twenty-second birthday. He added to his objection to a continuance, a one-line handwritten statement mentioning finally that he would "be 22 in September and if convicted would be ineligible for DCYOA [sic]," *i.e.,* that he would reach his twenty-second birthday on September 11 and lose his eligibility for sentencing under the YRA.

Even if we were to assume, as does the dissenting opinion, that appellant's oppositions to the government's motions for continuance constitute an assertion of the right to a speedy trial, they would not weigh heavily in the speedy trial analysis. *See Turner, supra,* 622 A.2d at 678–79. We have held that such objections do not have the force of a motion for a speedy trial and will not be accorded significant weight. *Id.; Sell, supra,* 525 A.2d at 1024–25 (significance of early and frequent assertion diminished by only one assertion during appeal); *Jackson, supra,* 503 A.2d at 1228–29 (timing and force of assertion made one year after arrest and two months prior to trial inadequate); *Graves, supra,* 490 A.2d at 1098–99 (minimal weight accorded to assertions in motion to dismiss and motion for release). Therefore, appellant's objection to the continuances would not be accorded significant weight, *Turner,* 622 A.2d at 678–79, and appellant's failure to assert his speedy trial rights explicitly, directly, and forcefully remains a formidable hurdle to prevailing on the claim under binding precedents. *See*

7. The government and appellant were ready for trial on September 5, 1989 and November 20, 1989, but there was a scheduling conflict with co-defendant's counsel, and the case was continued through January 24, 1990. On January 24, a new trial date was set for March 27, 1990, over appellant's objection, but it is not clear from the record whether all or part of the delay was to accommodate co-counsel or because of court congestion.

*Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2192; *see also Turner,* 622 A.2d at 678; *Graves,* 490 A.2d at 1098.

Further detracting from appellant's position on the assertion of his speedy trial rights is that the record does not reflect that he objected to a continuance of the trial date from September 5, 1989, six days before he reached his twenty-second birthday, to November 20, 1989. There is at least a possibility that his trial might have been completed before his birthday. It was an important time for appellant to object and demand a speedy trial if he desired one. When defense counsel agrees to several continuances, "it dilutes any assertion he may have made for a speedy trial." *Turner, supra,* 622 A.2d at 678. We note, however, that it was not the government which sought the continuance on this occasion, but counsel for co-defendant Smith. Both the government and appellant were ready for trial as they both were on January 24, when defense counsel for Smith again had to request a new trial date. Again, it does not appear from the record that appellant objected. Considering these circumstances, appellant's conceded failure to make a direct assertion of the right to a speedy trial, and appellant's somewhat delayed objections registered with the trial court, and given the weight accorded this particular factor under *Barker* and its progeny, this part of the analysis does not weigh in any significant way in appellant's favor.

The final factor for consideration in the analysis, is prejudice, which generally must be considered in light of the harm the speedy trial requirements address, namely: (1) to prevent oppressive pre-trial incarceration; (2) to minimize anxiety of the defendant; and (3) to limit the possibility of impairment of the defense, the most important. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *Jackson, supra,* 503 A.2d at 1229. Appellant does not claim prejudice related to any of these factors.[8] Instead, he argues that he could have been considered for sentencing under the YRA if his trial had occurred sooner. We have said that "[l]oss of the opportunity to be considered for youthful offender treatment is prejudice of a sort germane to speedy trial analysis." *United States v. Alston,* 412 A.2d 351, 361 (D.C.1980) (en banc) (citing *United States v. Roberts,* 515 F.2d 642, 646 (2d Cir.1975)). However, this harm must still be considered and balanced against the other *Barker* factors involved in the analysis. What seems to divide the majority from the dissenting opinion on the speedy trial issue is the weight our dissenting colleague accords the prejudice factor in the *Barker* analysis. However, we must be mindful in our consideration that no one factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial"; rather our decision requires a sensitive balancing of the length and reasons for the delay, the assertion of the right to a speedy trial, and prejudice. *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193.

*Roberts, supra,* 515 F.2d 642, relied upon by our dissenting colleague, differs in important respects from this case. In *Roberts,* a divided panel upheld the dismissal by the trial court of an indictment against a defendant on the ground that he had been denied a speedy trial.[9] In that case, unlike this one, three of the *Barker* factors were weighed heavily against the government in the court's analysis, and the other factor, assertion of the right to a speedy trial, was weighed only slightly against the defendant. *Id.*

Roberts, who was awaiting trial on multiple felony counts, had made an arrangement

8. It does not appear from the record that appellant's defense was impaired. Rather, the delay may have made possible the availability of favorable testimony given on appellant's behalf by his co-defendant Snipe, who pleaded guilty on August 2, 1989, just one month before the last trial date which preceded appellant's twenty-second birthday.

9. Judge Frederick van Pelt Bryan concurred in the result only on the ground that the trial court's decision constituted a proper exercise of judicial discretion. *Roberts, supra,* 515 F.2d at 648. The third member of the panel dissented, pointing out that a denial of the right had not been established, particularly in light of Roberts' failure to assert his speedy trial rights at a meaningful time, "in view of the Supreme Court's emphatic warning that 'failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.'" *Id.* at 649 (quoting *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193).

with the prosecutor to plead guilty to a misdemeanor information. Not until thirteen months after Roberts was indicted and six months after he had passed his eligibility date for treatment as a young adult offender did Roberts assert his right to a speedy trial. *See* 18 U.S.C. §§ 4209, 5010(a), 5021.[10] In reviewing the trial court's application of the multi-factor test of *Barker* in his opinion, Judge J. Joseph Smith concluded that attention to these variables supported the trial court's decision to dismiss. In Judge Smith's view, "the usual justification for assigning great, and perhaps decisive weight to [the] single factor[,] [assertion of the right was] plainly missing"; therefore, he concluded that this factor tended "to negative [Roberts'] speedy trial claim only slightly." *Roberts, supra,* 515 F.2d at 648.[11]

Significantly for purposes of comparison with the case before this court, the trial court in *Roberts* had found that the government had delayed the plea for its own benefit. Although Roberts had been prepared to enter a plea of guilty about the time of his arraignment, which was some seven months before he lost his Youth Act eligibility, the government refused to permit him to do so until he had delivered on a promise to testify for the government against another defendant. *Id.* at 646–47. However, the government had made no effort to bring to trial speedily the case in which it wanted Roberts to testify either. Thus, there was a finding that under those particular circumstances, both the length and reason for the delay weighed heavily against the government. *Id.*

This case is unlike *Roberts* where it was determined that the government had intentionally delayed the proceedings for its own benefit. *See United States v. Davis,* 679 F.2d 845, 850 (11th Cir.1982) (government acts at its own risk in prolonging a defendant's case deliberately and for its own benefit), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983); *United States v. Carini,* 562 F.2d 144, 149 (2d Cir.1977). Here, there is no claim that any of the delays attributable to the government were calculated to gain a tactical advantage at the expense of prejudice to the defendant. Moreover, in this case, the only "significant" delay attributable to the government occurred early in the case, and the remainder of the delay was neutral or for institutional reasons. The government was not responsible for the delay between September 5, 1989 and January 24, 1990. This part of the delay is attributable to counsel for the co-defendant Smith. Moreover, there is no basis here for weighing three out of the four *Barker* factors heavily against the government as occurred in *Roberts.*[12]

In summary, considering and balancing all of the *Barker* factors, the length and reasons for the delay, appellant's belated expression of an interest in resolving the case, the absence of a direct request for a speedy trial, and the nature of the prejudice asserted, we

10. The government argued unsuccessfully on appeal that the speedy trial guarantee afforded no protection to a defendant who had no expectation of going to trial and that Roberts' speedy trial rights had not been violated.

11. Judge Smith declined to weigh the assertion of the right against Roberts, concluding that he was probably ignorant of the need to do so. *Roberts, supra,* 515 F.2d at 647. In contrast, the dissenting judge pointed out that Roberts had been represented by counsel about whom no claim of ineffective assistance had been raised, and that knowing fully the terms of the plea agreement, they had never asserted a right to a speedy trial until many months after Roberts' eligibility for youth offender treatment had expired. Thus, in light of the Supreme Court's admonition in *Barker* about the consequences of failure to assert the right to a speedy trial, the dissenting judge would have vacated the trial court's judgment of dismissal. *Id.* at 649.

12. Since appellant did not raise the speedy trial question in the trial court, this court must rely on the record before us. Consequently, in the absence of any findings by the trial court concerning appellant's particular circumstances, this court cannot determine the degree of prejudice to appellant occasioned by the loss of the opportunity to be sentenced as a youthful offender. *Cf. Roberts, supra,* 515 F.2d at 646 (appellate court, crediting the trial court's findings that there was a " 'real and substantial' possibility that [Roberts] would receive the notable benefits of youthful offender treatment," held that "the loss of the right to be *considered* for youthful offender treatment amounted in this case to little less than loss of the right to *receive* such treatment"). The type of record apparently developed in *Roberts* is not available to this court for review.

conclude that appellant was not deprived of his right to a speedy trial.

For the foregoing reasons, the judgment of conviction appealed from hereby is

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

## I.

This is a most unfortunate case. Dickerson was born on September 11, 1967. He was arrested and charged with possession of cocaine with intent to distribute it (PWID) on May 3, 1988, more than sixteen months before his twenty-second birthday. As a result of a number of troubling incidents, which included the loss by the government of its case file, the consequent dismissal of the indictment for lack of prosecution, a four-month delay before reindictment, and the postponement of two scheduled trial dates because the prosecutor learned after the fact that government witnesses would be on committed leave, Dickerson's trial did not begin until May 4, 1990, two years after his arrest and eight months after he became ineligible for sentencing pursuant to the District of Columbia Youth Rehabilitation Act (DCYRA), D.C.Code §§ 24–801 *et seq.* (1989).

According to the report of the Pretrial Services Agency, Dickerson had no prior convictions, tested "clean" for drugs, and was employed at the Department of Justice. Under a discretionary sentencing scheme, he would have been a viable candidate for work release, for probation, and for sentencing as a youthful offender pursuant to the DCYRA. Because he went to trial after his twenty-second birthday, however, Dickerson received a mandatory minimum sentence; with DCYRA sentencing no longer a legally permissible option, the judge was powerless to consider any less severe sanction.

Much (though not all) of the delay in Dickerson's trial was attributable to the government. If the prosecutor had not lost the file, and if the government had not belatedly sought continuances from previously unopposed trial dates, Dickerson's trial could have been completed before his twenty-second birthday, and he would thus have been eligible for sentencing pursuant to the DCYRA, which authorizes penalties less severe than the mandatory minimum term prescribed for adult offenders. The loss of the opportunity for sentencing as a youthful offender has been held to constitute severe prejudice for speedy trial purposes, even where the defendant did little, if anything, to assert the right. *United States v. Roberts,* 515 F.2d 642, 646 (2d Cir.1975).

I recognize that dismissal of an indictment for lack of a speedy trial is a drastic remedy which can provide an undeserved windfall to a guilty defendant.[1] Such relief should be confined to situations in which there has been a long delay, substantially attributable to the government, in which the defendant has requested a timely trial, and in which he has been significantly prejudiced by its denial. Such cases are rare, but in my opinion this is one of them. I would therefore reverse Dickerson's conviction because he was denied his constitutional right to a speedy trial. Accordingly, I respectfully dissent.

## II.

In assessing Dickerson's speedy trial claim, we must consider (1) the length of the delay; (2) the reason for the delay; (3) Dickerson's assertion of the right; and (4) prejudice. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). I address each of these factors in turn.

### A. *Length of the Delay.*

Dickerson's trial began two years and one day after his arrest. As the government acknowledges in its brief, "[t]his court has frequently held prejudice sufficient to trigger inquiry will be presumed when, as in the instant case, the delay exceeds one year." *See, e.g., Graves v. United States,* 490 A.2d 1086, 1091 (D.C.1984) (en banc), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Indeed, a delay of more than a year "gives prima facie merit to a claim that an

1. I agree with the majority that the evidence against Dickerson was sufficient to support his conviction, although the case is not the strongest that has come across my desk.

accused has been denied the right to a speedy trial, creates a presumption of prejudice, and shifts the burden to the government to justify the delay." *Id.* (footnotes omitted). In the present case, the chronological delay was twice that long, and the government's burden increases proportionally. *Id.* (citations omitted).

I agree with the majority that we should not attach too much significance to the length of the delay standing alone. Dickerson was not incarcerated. Under these circumstances, one part of the two-year period—the four months between the dismissal of the initial indictment in September 1988 for want of prosecution and Dickerson's reindictment in January 1989—is not counted for speedy trial purposes, although it would be relevant to due process analysis. *See United States v. MacDonald,* 456 U.S. 1, 8–10, 102 S.Ct. 1497, 1502–03, 71 L.Ed.2d 696 (1982); *Givens v. United States,* 644 A.2d 1373, 1374–75 (D.C. 1994) (per curiam); *cf. Wynn v. United States,* 538 A.2d 1139, 1142 n. 7 (D.C.1988). Moreover, the delay in bringing Dickerson to trial after September 11, 1989, though unfortunate, did not contribute to the only substantial prejudice of which he complains, namely, his ineligibility for sentencing pursuant to the DCYRA; it is therefore the delay *before* Dickerson's twenty-second birthday that is critical to the analysis. Nevertheless, the length of time that passed between arrest and trial was substantial and "presumptively prejudicial." *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192.

Moreover, the length of any permissible delay is closely related to the danger of prejudice. In *Roberts, supra,* a case with facts remarkably similar to those before us, the court explained the relationship as follows:

> At the time of Roberts' motion to dismiss, the postindictment delay was considerably shorter than others countenanced by this court. (Citations omitted). On the other hand, as the Court made clear in *Barker v. Wingo, supra,* 407 U.S. at 530–31, 92 S.Ct. at 2182, a delay not patently unreasonable in length may nonetheless be intolerably long in light of "the peculiar circumstances of the case." And a peculiarity of the instant case highly relevant in this regard was the government's ability to predict with great certainty that Roberts would be seriously prejudiced in the event that he was not permitted to plead guilty prior to his 26th birthday. After that date, Roberts lost his right, *see Dorszynski v. United States,* 418 U.S. 424, 443–44, 94 S.Ct. 3042 [3052–53], 41 L.Ed.2d 855 (1974), to be considered by the sentencing judge for youthful offender treatment.

*Id.,* 515 F.2d at 646. In the present case, the delay between arrest and trial was unusually long, and the reasoning of *Roberts* applies *a fortioiri.*

*B. Reasons for the Delay.*

"The flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk,* 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986). Because of the nature of the prejudice claimed in this case, I will primarily focus once again on the reasons for the delay prior to Dickerson's twenty-second birthday. This is the key inquiry in determining the government's role in the events that led to the loss of Dickerson's eligibility for sentencing pursuant to the DCYRA.

Dickerson was arrested on May 3, 1988. He was indicted on May 25, 1988, and arraigned on June 8 of that year. The indictment was dismissed in September, 1988, after the government was unable to provide discovery because the prosecutor could not locate the file.

Dickerson and his codefendant were reindicted on January 11, 1989, four months after the dismissal of the original indictment. Solely as a result of the mishandling of the file, the prosecution was no further along in January, 1989 than it had been in June, 1988.

At a status hearing on February 28, 1989, the judge set trial for June 12, 1989. The prosecutor interposed no objection, thus implicitly representing that the government would be ready on June 12. Nevertheless, on April 17, 1989, seven weeks after it had agreed to go to trial on June 12, the government filed a motion for a continuance, alleging that two police witnesses were scheduled for committed leave on that date. If this

information had been provided to the court at the status hearing, a mutually acceptable alternative date might have been available, and the delay might have been minimized. Dickerson opposed any continuance, but the judge granted the government's motion over defense objection.

At another status hearing on May 16, 1989, the judge rescheduled the trial for August 2, 1989. Once again, the prosecution made no timely objection. On June 15, 1989, however, a full month after the status hearing, the prosecutor requested a second continuance, again because government witnesses were scheduled to be on leave on the previously agreed upon date. Counsel for Dickerson again objected, pointing out that his client would be twenty-two years old on September 11, 1989 and would lose his eligibility for DCYRA sentencing if the case extended beyond that date. On August 2, 1989, the judge granted the government's motion and set a new trial date for September 5, 1989, six days before Dickerson's approaching birthday.

On September 5, 1989, the prosecution and Dickerson announced ready, but counsel for Dickerson's codefendant was in trial. A new judge who had taken over the calendar continued the case until January 24, 1990, and Dickerson's hopes, if convicted, of being sentenced pursuant to the DCYRA were now history. On May 4, 1990, after further delays, the trial began before a third judge. Dickerson, now well into his twenty-third year, was found guilty of PWID. On June 22, 1990, the judge imposed the mandatory minimum sentence required by law.

The foregoing recitation demonstrates the obvious; most, though not all, of the delay prior to September 11, 1989, was attributable to the prosecution. Seven months—the period between June 1988 and January 1989—were lost because the prosecutor could not find the file, and because a second indictment was therefore required to replace the first. The government then agreed to two successive proposed trial dates, but subsequently sought continuances on the basis of witnesses' plans for leave. It was the prosecutor's responsibility to learn of these leave plans in advance and to inform the judge *before* the trial date was set. *See also Roberts, supra,* 515 F.2d at 647 (the delay in similar case was not of government's "active making," but attributable to prosecution's inactivity in bringing the case towards trial).

A portion of the delay prior to September 11, 1989—not very much—was attributable to court congestion or other ordinary institutional factors which weigh less heavily against the government than do delays directly attributable to the prosecution. *Graves, supra,* 490 A.2d at 1092; *see also Miller v. United States,* 479 A.2d 862, 866 (D.C.1984). The principal causes of the delay, however, were the loss of the government's file and the successive prosecution motions to continue previously accepted trial dates.

*C. Assertion of the Right.*

Following his client's initial indictment, Dickerson's attorney sought discovery. When the prosecutor could not provide it, counsel successfully moved to dismiss the indictment for lack of prosecution; there was no occasion to request a trial date. For the four months following the dismissal, no charges were pending, and no request for a speedy trial could be made.

On January 11, 1989, Dickerson was reindicted, and on February 28, the trial was set for June 12, 1989, well in advance of his birthday. There was no reason why this date should not be satisfactory to Dickerson, and his attorney understandably made no protest. As soon as the prosecution switched gears and requested a continuance, defense counsel filed an opposition in which he stated:

> Defendant Dickerson opposes the Government's motion for a continuance. Defendant has already missed numerous days from work. The case has already been dismissed because the Government was not ready, and *Defendant is anxious to resolve this case.*

(Emphasis added). Although counsel did not use the term "speedy trial," he made it plain in the italicized phrase that he was asking to be tried on the scheduled date, not later.

The June 12 date was scratched, and the trial was re-set for August 2, 1989. Once again, the prosecutor requested a continuance. Dickerson again filed an opposition, which was substantially identical to the opposition filed in response to the earlier government motion, except that on this occasion Dickerson's attorney added that "Defendant will be 22 in September and if convicted would be ineligible for DCYRA." Dickerson thus not only apprised the court of his wish to be tried without further delay, but also explicated the urgency of the matter in light of the court's potential loss of sentencing options in the event he was convicted.[2]

The invocation of the right to a speedy trial "is not dependent on the uttering of court-ordered incantations." *Graves, supra,* 490 A.2d at 1098. I agree that Dickerson's trial counsel should have been more forceful, and that a direct request for a speedy trial, using the language of the Constitution, would have been preferable, but ideal phraseology was not required. *Id.* In regard to the adequacy of the assertion of the right, this case is more favorable to the defense than *Lemon v. United States,* 564 A.2d 1368, 1377–79 (D.C.1989), in which the court found sufficient a defendant's less than zealous opposition to prosecution requests for continuances. Here, Dickerson made at least reasonable efforts to move this case to trial before his twenty-second birthday, and I do not believe that his counsel's use of nontechnical phraseology should count heavily in the court's calculus.[3]

*D. Prejudice.*

I view the prejudice to Dickerson in this case as devastating. Because the government "blew it" on the administrative side, Dickerson, who was only twenty years old at the time of the offense, had to serve a mandatory minimum term of twenty months to five years, without being considered for DCYRA sentencing. To me, this represents a breakdown of the statutory scheme and an unintentional but nevertheless real miscarriage of justice. Nobody intended to deny Dickerson his rights,[4] but "it is of no consolation to [Dickerson] that it was done in good faith." *Cf. Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961).

This court stated in *Graves,* 490 A.2d at 1101, that

> [t]he final factor, prejudice to the defendant, is to be assessed in the light of the interests which the speedy trial right was designed to protect, namely: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193.

Of these three interests, prevention of the impairment of the defense is the most important. *Id.* at 1101–02. In the present case, at least insofar as sentencing is concerned,[5] the delays did more than "impair" one aspect of the defense; they destroyed it. Perhaps the most important sentencing option available to

2. The majority points out that, so far as we can determine from the record, Dickerson did not again object on September 5, 1989 to a further continuance. Although this is true, the court had denied his motion for a severance a few weeks earlier. In the absence of counsel for the codefendant, the trial could not proceed without a severance. Dickerson's trial attorney doubtless should have been more forceful and specific in asserting his client's rights, but in this instance a further request would probably have been futile.

3. In *Roberts, supra,* the court assigned little weight to the defendant's failure to demand a speedy trial because it opined that he probably did not personally know that he would no longer be eligible for sentencing as a youthful offender after his twenty-sixth birthday. 515 F.2d at 647–48. In this case, Dickerson was substantially more forceful than Roberts was in opposing further delay in his trial.

4. Most of the delay in this case was "less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion." *Graves,* 490 A.2d at 1092.

5. It has long been settled that prejudice to the defendant in relation to available sentencing options is a legitimate part of the speedy trial calculus. "[T]he possibility that a defendant already in prison might receive a sentence at least partially concurrent with one he is serving may be forever lost if trial of the pending charge is postponed." *Smith v. Hooey,* 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969).

the defense in the case of a twenty-year-old offender—the DCYRA—was rendered inoperative in this case largely as a result of delays created by the government.

When a similar situation arose in *Roberts,* the court was emphatic in its articulation of the prejudice suffered by the defendant:

> As a result of the delay, Roberts lost an excellent opportunity to be given, upon pleading guilty, a youthful offender probationary sentence and the chance to have the conviction expunged from his record. Deference to the district court's view on Roberts' probable qualification for youthful offender status, furthermore, also has the effect of making the length of delay factor a weighty one in Roberts' favor. *To allow the more than seven months between Roberts' indictment and his birthday to pass was egregious delay in light of the virtual certainty that serious harm would befall Roberts as a consequence.*

515 F.2d at 646 (emphasis added). The delay in this case was much longer than seven months.[6]

Dickerson was a first offender. His urine test at the time of arrest was favorable.[7] He was employed. I cannot read the mind of the trial judge, but sentencing pursuant to the DCYRA would surely have been a reasonable option if the case had been completed on time.

If the DCYRA had been available, the sentencing judge would not have been required to impose a twenty-month mandatory minimum sentence. On the contrary, a number of alternatives could have been considered. First, the judge could have ordered a "Youth Act" study pursuant to D.C.Code § 24-803(e), and might well have learned a great deal about Dickerson. If Dickerson proved to be an appropriate candidate for probation—many young, employed first offenders are—a probationary term might have been imposed. If probation turned out to be an unacceptable risk, work release, which would have enabled Dickerson to retain his job, would surely have been a possibility. Even if the judge concluded that incarceration was appropriate, perhaps three months or six months or nine months or a year would have been sufficient, rather than twenty months to five years. Moreover, incarceration pursuant to the DCYRA would have been served with other young offenders, and Dickerson would (or at least should) have received "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders." D.C.Code § 24-801(5). Finally, an offender sentenced pursuant to the DCYRA has the right to apply to have his conviction unconditionally set aside. D.C.Code § 24-806. None of these opportunities was made available to Dickerson. The prejudice to him was severe and palpable and, as in the *Roberts* case, altogether unacceptable.

## III.

The government writes in its brief that

> [f]or appellant to assert that his conviction should be overturned because the trial court sentenced him after his twenty-second birthday is patently frivolous.

The government did not mention *Roberts;* the defense did not cite it either.

As I see this case, Dickerson has had to serve a mandatory minimum sentence primarily because someone lost or mislaid the file, and because the prosecutors agreed to two separate trial dates without first ascertaining whether their witnesses would be on leave. In my view, the loss of appropriate sentencing options for such reasons did not afford Dickerson equal justice under law. To mock Dickerson's plea for justice in the man-

6. In *Roberts,* as my colleagues point out, the comparatively brief delay in processing the defendant's plea came about in part because prosecutors wanted his testimony against another defendant but did not attempt to accelerate the other defendant's trial date. In the present case, the government prolonged an already long delay for its own benefit by opposing Dickerson's motion for severance and thus avoiding the need to present its evidence twice. The two situations, in my view, are not qualitatively different.

7. Ironically, being no addict, Dickerson was ineligible for the "addict exception" from mandatory minimum sentencing. *See Dupree v. United States,* 583 A.2d 1000, 1004 n. 5 (D.C.1990); *see also id.* at 1004-05 (concurring opinion).

ner quoted above does the government little credit.

I respectfully dissent.[8]

---

**8.** The prejudice suffered by Dickerson as a result of prosecution-induced delay related to his sentence, rather than to the question of guilt or innocence, and it would therefore be more logical to remand for resentencing than to dismiss the indictment. In light of the mandatory-minimum sentencing scheme and the age limit for DCYRA eligibility, however, I know of no way in which relief directly solely to the sentence could legally be fashioned.