Lonzo MITCHELL, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CM–1256.

District of Columbia Court of Appeals.

Argued June 24, 1996.
Decided Aug. 22, 1996.

Donald W. Whitehead, Jr., Ellicott City, appointed by this court, for appellant.

Ronald W. Sharpe, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, and Nancy B. Bukas, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

**112**

REID, Associate Judge:

After a bench trial, appellant Lonzo Mitchell was convicted of possession of heroin, in violation of D.C.Code § 33–541(d) (1993 Repl.). He was sentenced to one hundred and twenty days of incarceration, with work release from five a.m. to four p.m. Mondays through Fridays. He filed a timely appeal. Mitchell contends (1) the trial court improperly denied his right to a jury trial because possession of a controlled substance is not a petty offense, and (2) the evidence was insufficient to support his conviction. We reverse because we conclude that the evidence was insufficient to support Mitchell's conviction.

## FACTUAL SUMMARY

On November 8, 1994, at eleven fifty-five a.m., Officer Chris Silva of the United States Park Police noticed that a Buick automobile traveling near 8th and M Streets, S.E. had Virginia tags but no Virginia inspection sticker. He stopped the vehicle which was driven by Mitchell. Mitchell gave his driver's license and vehicle registration to Officer Silva. When the officer ran a check on the license, he was informed, erroneously, that there was an outstanding warrant for Mitchell's arrest. He called for backup units. When they arrived, Mitchell was placed under arrest and handcuffed.[1] The handcuffs had a "double-locking mechanism" to preclude any movement of the cuffs. The police did a pat-down search of Mitchell for weapons and drugs and found none.[2] The officers also searched the police vehicle that would take Mitchell to the police station. The search was designed to ensure that no weapons and contraband were in the police vehicle. The officers found no weapons, drugs or anything else.[3] They placed Mitchell in the police vehicle. After Mitchell's car was searched, Officer Silva took him to the police substation for processing.

Prior to transporting Mitchell to the station, Officer Silva noticed Mitchell "squirming" in the back seat of the police vehicle while his hands were handcuffed behind his back and crossed at the wrists, but did not investigate the reason for the squirming. The squirming did not take place for "an extended period of time." He parked the police vehicle in the "substation parking lot," a "fenced-in area" with a gate which is not locked. The vehicle was not locked. Signs were posted which said "authorized personnel only, government vehicles only [and] no trespassing." Although the public had no right of access to the area, the area was accessible. The police vehicle was not searched immediately after Mitchell was removed. However, approximately forty-five minutes later, Officer Silva conducted another search of the vehicle prior to taking Mitchell to the central cell block. He found "a clear zip-lock baggie that was underneath the seat where Mitchell had been sitting, and a white powdery substance that had been spilled out of the bag" onto the blue carpet underneath the seat which Mitchell had occu-

1. The backup unit included Officer William Sepeck. At trial Sepeck said he "was directed to respond to the scene because it was my originating warrant." The trial court refused to allow inquiry into the warrant because the parties stipulated that it was "erroneously issued." On cross-examination Officer Silva said he called in Mitchell's social security number. The call produced a profile of a person with the last name of Mitchell who had a similar date of birth and a similar scar on the left knee. However, the officers determined that Mitchell was not the person named in the warrant. Officer Sepeck said he thought the warrant was "an outstanding drug warrant."

2. On direct examination Officer Silva said he conducted "a search for weapons, checked [Mitchell's] pockets to make sure there wasn't

any drugs in his pocket or anything like that." He described the search as "basically a pat down search, looked to make sure there was nothing on the sides of his body." On redirect examination Officer Silva testified that he did not "look inside" Mitchell's underwear. He also said he did "a good pat-down that's called a crush and feel for weapons."

3. During the search, Officer Silva "searched the floorboard, on the [rear] seat [where Mitchell was to be placed] and under the seat." He removed the rear bench seat, checked behind it, and looked at the carpet underneath the seat. He saw nothing. He indicated that a Park Police policy requires officers to search a vehicle "prior to and after transport" of an accused. He was not asked whether the search of the vehicle must take place immediately after transport.

pied.[4] He summoned Officer Sepeck who gathered the white powder in a zip-lock bag for testing.[5] Officer Sepeck said he saw the white powder "under . . . the rear seat behind the passenger side just off to the middle . . . to . . . [Mitchell's] left side." Tests revealed that the powder was heroin. Officer Sepeck said the zip-lock bag was open. He was not asked the exact location of the zip-lock bag in relationship to the white powder on the blue carpet. The zip-lock bag was not tested for fingerprints and no photographs were taken before the zip-lock bag and white powder were removed from the police vehicle.

At the close of the government's evidence, the trial court denied a defense motion for judgment of acquittal. Mitchell decided to testify in his own behalf. He said the police "patted [him] down . . . and took everything out of [his] pockets." He was handcuffed and placed in the back of the police vehicle. He denied having any heroin on his person. He also said he did not see Officer Silva remove the rear seat before he was placed in the police vehicle. At the time of his arrest, he was wearing sweat pants with an elastic drawstring and a straight leg instead of an elastic bottom. When asked "[c]ould you have reached your hands inside the drawstring of your sweat pants" he responded "[[y]eah]." In reply to a redirect examination question he said he could not have reached "all the way [to] the bottom" of his underwear. After the trial judge posed certain questions to Mitchell, the prosecutor asked a few recross questions. Thereafter in a bench conference the prosecutor advised the trial court that she wished to impeach Mitchell with prior convictions, but that she had only a certified copy of a 1992 conviction for possession with intent to distribute heroin, and no certified copies of old convictions. After objection by counsel for Mitchell, the trial court refused to allow the prosecutor to proceed because of the untimeliness of the prosecutor's effort to impeach Mitchell, and due to the government's failure to "[establish] a foundation to impeach the Defendant."

At the conclusion of his testimony, Mitchell renewed his motion for judgment of acquittal. The trial court denied the motion.

## THE TRIAL COURT'S DECISION

The trial court determined that (1) "[t]he case pretty much turns on credibility" and the officers' testimony was credited; (2) "the [d]efendant was indeed in possession of a controlled substance, the heroin, and that he did so knowingly and intentionally based on the evidence that has been submitted;" and (3) the "circumstantial evidence [was] sufficient . . . to dispel reasonable doubt as to Defendant's innocence, and reasonable doubt is dispelled because the evidence is strong." The main factors which prompted the trial court's conclusions were Officer Silva's search of the vehicle by removing the rear seat prior to transporting Mitchell to the police station; the location of the transport police vehicle "in an area that was not accessible to the public"; the "white powder [which] contrasted with the blue carpet and apparently was easy to detect"; the search of the transport vehicle after Mitchell's processing had ended, and Mitchell's own testimony that his sweatpants allowed him to "reach inside his other pants . . . where he could have secreted the drugs and reached them." The trial judge also indicated "the squirming on the seat is a factor the Court must take into consideration because it has some meaning."[6]

## ANALYSIS

### I.

■ Mitchell contends that he was entitled to trial by jury under the Sixth Amendment

---

4. On cross-examination, Officer Silva testified that all of the white powder was "underneath the seat" and "towards the rear portion of the seat." He said that "the front of the seat is closed off" and "[n]othing can be shoved under it."

5. Officer Sepeck testified that he "lifted up the back seat" and found "a clear zip-lock with white powder residue inside of it, and on the blue carpet of the patrol car was white powder, also." He further stated that the "zip-lock [was]

on the blue carpet in addition to the white powder" and he "took a piece of cardboard, scraped the powder from the carpet into the zip-lock." The blue carpet was "underneath the seat on top of the . . . floor panel."

6. The trial court also said "[w]hat [the squirming] means with respect to the evidence and the proof is open to interpretation."

to the Constitution because the offense with which he was charged was a serious and not a petty offense. We rejected an identical contention in *Foote v. United States*, 670 A.2d 366 (D.C.1996). *See also Young v. United States*, 678 A.2d 570, 571 (D.C.1996). The maximum penalty Mitchell could have received under the Misdemeanor Streamlining Act of 1994 [7] was imprisonment for not more than one hundred and eighty days, or a fine of not more than $1,000, or both. Hence, he was not entitled to trial by jury because he was charged with a petty offense. *Id.*

## II.

■ Mitchell argues that there was insufficient evidence to convict him of possession of a controlled substance (heroin) beyond a reasonable doubt.[8] To prove possession of a controlled substance beyond a reasonable doubt, the government must show that the defendant:

(1) possessed a controlled substance; and

(2) did so knowingly and intentionally.

This means consciously, voluntarily, and on purpose, not mistakenly, accidentally or inadvertently.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.28 (4th ed. 1993). After setting forth these elements of the offense of possession, the trial court determined that Mitchell had actual possession of the zip-lock bag containing the heroin. Actual possession means "the ability ... to knowingly exercise direct physical custody or control" over the heroin. *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.1981), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981).

## A.

■ In considering the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the government, recogniz-

ing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States*, 650 A.2d 680, 683 (D.C.1994) (citing *Leonard v. United States*, 602 A.2d 1112, 1114 (D.C.1992)). The evidence is deemed insufficient "only if we conclude, as a matter of law, that no impartial [factfinder] could rationally find guilt beyond a reasonable doubt on the evidence presented." *Roy v. United States*, 652 A.2d 1098, 1103 (D.C. 1995). However, "[a] conviction cannot rest on mere possibilities[,]" and "[a]n inference built upon another inference is too tenuous an evidentiary foundation to support a criminal conviction." *Malloy v. United States*, 246 A.2d 781, 783 (1968).

## B.

To reach its conclusion that Mitchell possessed the zip-lock bag which contained heroin, the trial court had to make at least four key inferences. First, the zip-lock bag containing heroin was in the waistband of Mitchell's sweatpants or underwear when he was searched, but the police officer's "crush and feel" search could not detect it. Second, by squirming, Mitchell was able to remove the zip-lock bag from his sweatpants or underwear, while his hands were cuffed in a double-locking mechanism, and push it down the back of his seat in a way that it opened only after clearing the seat. Third, during the forty-five minute period required for processing Mitchell at the police station: (a) no one else was transported in the vehicle; (b) no unauthorized person entered the unlocked gate; and (c) no one entered the unlocked vehicle.

To determine whether the trial court's conclusions are based upon reasonable inferences, or upon mere possibilities, or inferences built on inferences, we *focus on several questions*. First, if Mitchell had the zip-lock

---

**7.** Misdemeanor Streamlining Act, Title I, D.C. Act 10–238, 41 D.C. Reg. 2608, 2610 (1994), D.C. Code § 33–541(d) (1996 Supp.).

**8.** D.C. Code § 33–541(d) provides in pertinent part:

It is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his or her professional practice, or except as otherwise authorized by this chapter.

bag on his person prior to being transported to the police station, how did the police officer miss it during the "crush and feel" search of his person? The trial court determined: "[A]fter the [d]efendant was transported, and a search subsequently made, and the drugs ultimately found in exactly the same area where the [d]efendant had been in the vehicle, there is only but one conclusion, that the drugs were placed there by the [d]efendant." To reach this determination, the trial judge inferred, by process of elimination, that the zip-lock bag had been located in "the lower backside [of Mitchell's sweatpants] where the elastic band of either his underwear or his sweatpants [was] situated." [9] During the government's closing argument, the prosecutor stated "I believe those areas were available to hide heroin in. I think the evidence has shown that he could have hidden something in those. The clothes were loose-fitting enough and he had access to the inside of those clothes." When the trial judge inquired "[o]n the basis of the access alone, isn't that speculation," the prosecutor referenced Mitchell's testimony that he could get his hands partially into the back of his sweatpants. There was no testimony concerning the actual scope of a "crush and feel" search and whether it ordinarily covers the area of the waist. The trial court's findings indicate that "the officer conducted a pat-down search," but other than mentioning the pockets of Mitchell's sweatpants, the trial judge does not address the scope of the search and whether it is reasonable to infer that an officer who conducts a "crush and feel" search, and who is looking for drugs as well as weapons, would have felt or examined the waist area of the sweatpants and the underwear band.

Second, assuming without deciding, that the zip-lock bag was concealed in either the elastic waist band of Mitchell's sweatpants, or the waist band of his underpants, how did he get it out of his sweatpants while his hands were cuffed with a double-locking mechanism? Furthermore, if the bag was open, how did the contents get onto the blue carpet underneath the seat without any pow-der being found on the rear seat; or, if the zip-lock bag was sealed when Mitchell supposedly removed it from his sweatpants, how and when did it open so that the contents spilled toward the center and left of the area where Mitchell was seated? The trial court answered these questions in part as follows:

> The Court must then examine whether the Defendant, whose hands were cuffed behind him, could have reached the drugs in that limited area of his body and his clothing that the drugs could have been hidden, and this Court is satisfied, based on the testimony of the Defendant, that the clothing and type of clothing that he was wearing allowed him access to, number one, reach inside the back of his outer and inner clothing, at least reach inside the waistband area and possibly reach inside his other pants, to other areas of his body so that could have—where he could have secreted the drugs and reached them and, once having access to them, dropped them or attempt to secrete them between the bench seat and backrest of the rear seat area, where they could have dropped on the floor and where they were ultimately recovered by Officer Sepeck.

The zip-lock bag was found open underneath the rear seat, and according to Officer Sepeck, the white powder was "under . . . the rear seat behind the passenger side just off to the middle . . . to . . . [Mitchell's] left side." When asked whether the white powder was "around the seat," Officer Silva responded "no, underneath the seat." He said that all the white powder was "underneath the bench seat in the rear." There was no access to the area underneath the bench seat from the front, because the front was enclosed at the bottom, with the cushion resting on the enclosure. Although Mitchell was observed "squirming" momentarily, there was no testimony that he was seen leaning forward or engaging in any furtive movements. In essence, the trial court concluded that because Officer Silva saw nothing on the carpet when he removed the back seat and searched the area prior to transporting

9. Since the officers searched the pockets of Mitchell's sweatpants, the zip-lock bag could not have been located there. The trial court also rejected the possibility that the bag was in Mitchell's closed fist during the officer's search of his person.

Mitchell to the police station, and because Officer Sepeck saw the zip-lock bag and white powder underneath the seat before taking Mitchell to the central cell block after processing, the only reasonable explanation is that Mitchell somehow reached into the back of his sweatpants, removed the zip-lock bag while handcuffed with a double-locking mechanism, and shoved it down the back of the seat in such a manner that it opened and the contents spilled on the blue carpet to the left of where Mitchell was seated. The trial court's conclusion was not aided by any photographs of the transport vehicle taken before Mitchell was transported to the substation, or at the time Officers Silva and Sepeck found and observed the zip-lock bag and powder. Nor was the trial court's conclusion supported by a report on any fingerprints that might have been lifted from the bag.

Third, is it reasonable to conclude that no one else put the zip-lock bag in the transport vehicle even though it was accessible because it was left unlocked for a forty-five minute period and because the gate to the parking area was also unlocked, despite the presence of signs indicating that the public had no authority to enter? The trial court did not address the forty-five minute period during which the transport vehicle was not searched after Mitchell's removal from it. The transport vehicle was parked by three other vehicles in a parking lot which was fenced in and inaccessible to the public, but the gate to the area was not locked and the transport vehicle itself was left unlocked. Officer Silva testified that he did not know whether the transport vehicle had been used the night before Mitchell was transported; nor did he know the last person to be transported prior to Mitchell. Neither he nor Officer Sepeck was asked whether the vehicle had been used or accessed during the forty-five minute processing period.

## C.

In *Malloy v. United States, supra,* a case involving a bench trial, this court reversed a conviction for unlawful possession of heroin. In that case, two police officers saw the defendant make a " 'quick motion,' as if he was throwing something away," but they could not find anything in the area around him. 246 A.2d at 783. After the defendant left the area and the search continued, a small silver wrapper containing white capsules (heroin) was found. The court concluded, "as a matter of law, that the Government failed to meet its burden of proof with respect to appellant's possession." *Id.*[10] Based upon our review and analysis of the record before us, we are constrained to conclude that the trial court's judgment rests upon one inference after another. What we said in *Malloy* is applicable here, "[a]n inference built upon another inference to prove a material fact is too tenuous an evidentiary foundation to support a criminal conviction." 246 A.2d at 783. Further, "[t]he evidence is insufficient, ... if in 'order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.' " *Roy v. United States,* 652 A.2d 1098, 1103 (D.C.1995) (quoting *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987)). We conclude that the government failed to prove that Mitchell possessed a controlled substance beyond a reasonable doubt.

For the foregoing reasons, we reverse Mitchell's conviction for possession of a controlled substance (heroin), and remand the case to the trial court with directions to enter a judgment of acquittal.

*Reversed and remanded.*

SCHWELB, Associate Judge, concurring:

I am pleased to join Judge Reid's opinion for the court. I add a few observations from a slightly different perspective.

---

10. The court stated:

At most, the Government created only a strong suspicion that appellant had ever had the "silver wrapper" in his possession. It was never seen in his hand, and it was never seen being thrown by him. In view of the difficulty the officers had in finding the wrapper and the fact that the area was open to all who visited the hospital and to all employees, the distinct possibility is raised that the wrapper had been dropped there by someone other than appellant. The Government's evidence fails to negate this reasonable inference. To uphold the conviction we would have to infer from the evidence, first, that appellant threw something, and, second, that that something was the wrapper which was later found.

To prove that Mitchell was guilty, the prosecutor had to establish that all of the following propositions were true:

1. that Mitchell had heroin on his person, but that the police did not search him thoroughly enough to discover it;

2. that the police searched the car before placing Mitchell in it, and that this search *was* sufficiently thorough to ensure that the heroin must have been placed in the vehicle after the search;

3. that Mitchell was able to dispose successfully of the heroin with his hands cuffed behind him;

4. that Mitchell "squirmed," apparently while disposing of the heroin, but that the police did not investigate or take any action; and

5. that although Mitchell's activities while handcuffed apparently caused some of the white powder to spill out of the zip-lock baggie on to the floor of the police car, no powder was recovered from Mitchell's slacks or his underwear.

Each of these propositions, considered alone, may be plausible. I do not believe, however, that an impartial trier of fact could fairly conclude, beyond a reasonable doubt, that all five of them were established.

That is not all. The government could have produced photographs of the interior of the police car and of the spilled powder, so that the trier of fact could more readily assess the plausibility of the prosecution's version of events. It did not do so. The production of weak evidence, where strong evidence would ordinarily be available, warrants an inference against the proponent of such evidence; indeed, in some instances, it will compel such an inference. *See, e.g., Murphy v. McCloud*, 650 A.2d 202, 215–17 (D.C.1994); *cf. Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Moreover, the fact that the police car was left unguarded for some period of time presents a kind of "chain of custody" problem which further weakens the prosecution's case.[1]

Finally, one might reasonably have doubts about another aspect of the prosecution's case. Officer Silva stopped Mitchell in southeast Washington because the car he was driving had Virginia tags but no Virginia inspection sticker. He testified that he thereafter arrested Mitchell because, when he ran a check on Mitchell's social security number and driver's license, he was erroneously advised that there was an outstanding warrant for Mitchell's arrest. According to the government's evidence at trial, the warrant was actually for someone else named Mitchell who had a similar date of birth and a similar scar on his left knee. All of this is very mysterious. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C.1992).

This is a close case. The trial judge was on the scene. He heard the testimony and observed the demeanor of the witnesses. Mitchell may well have been guilty.[2] Never-

---

1. Personally, however, I do not attach a great deal of significance to this aspect of the case. The possibility that some civilian third party placed heroin in a police car in order to incriminate Mitchell appears remote. It is theoretically possible that the police planted the contraband, but there is no evidence that this occurred.

2. I do not want the reader to infer that I believe that Mitchell was framed. I note, albeit from a concededly unorthodox perspective, that there is information in this record—specifically, two prior heroin-related convictions—which logically makes it a great deal more likely that Mitchell committed this offense, which also involved heroin. "[A] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Cruz–Foster v. Foster*, 597 A.2d 927, 930 (D.C.1991) (quoting *State v. Krol*, 68 N.J. 236, 344 A.2d 289, 302 n. 12 (1975)); *cf. United States v. Crowder*, 318 U.S.App.D.C. 396, 407, 87 F.3d 1405, 1416 (1996) (en banc) (concurring opinion of Silberman, J., joined by Buckley and Williams, JJ., at 1) ("evidence that a defendant charged with a drug distribution crime has previously committed drug distribution crimes should be admissible to show likelihood (propensity, if you will) that the defendant did it again"). I recognize, of course, that the information about Mitchell's convictions, albeit obviously probative, was not presented to the court until the prosecutor's recross examination, that it was therefore excluded as untimely, even for impeachment, and that, under current law, it was plainly inadmissible to show that Mitchell "did it" this time. *See, e.g., Thompson v. United States*, 546 A.2d 414, 418–20 (D.C.1988).

theless, on the basis of the unusual assortment of problems and difficulties which characterized the government's case, I agree with Judge Reid that, as a matter of law, there was a reasonable doubt of Mitchell's guilt.